_Richard Grissom #33728_
Name

_EDCF, P.O. Box 311_

_El Dorado, KS 67042_
Address

---

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| _Richard Grissom #33728_ , Plaintiff<br>*(Full Name)* | CASE NO. 15-3221-SAC-DJW<br>(To be supplied by the Clerk) |
| V. | |
| Defendant (s)<br>_Raymond Roberts, et al.,_ | CIVIL RIGHTS COMPLAINT<br>PURSUANT TO 42 U.S.C.<br>§1983 |

### A. JURISDICTION

1) _Richard Grissom #33728_ , is a citizen of _Kansas_
   *(Plaintiff)* *(State)*

   who presently resides at _El Dorado Correctional Facility_ , _P.O. Box 311,_
   *(Mailing address or place*
   _El Dorado, KS 67042_ .
   *of confinement.)*

2) Defendant _Raymond Roberts_ is a citizen of
   *(Name of first defendant)*

   _Topeka, Kansas_ , and is employed as
   *(City, State)*

   _Secretary Of Corrections_ . At the time the
   *(Position and title, if any)*

   claim(s) alleged in this complaint arose, was this defendant acting under the color of state

   law? Yes ☑ No ☐ If your answer is "Yes", briefly explain:

   _He is legally responsible for the overall operation of the Department and each_
   _institution under its jurisdiction, including EDCF. He is the supervisor who_
   _created the policy and procedures, and wields authority over staff and inmates._

3) Defendant *Johnnie Goddard* _____ is a citizen of
     *(Name of second defendant)*

   *Topeka, Kansas* _____ , and is employed as
     *(City, state)*

   *Deputy Secretary Of Facilities Management* _____. At the time the
     *(Position and title, if any)*

   claim (s) alleged in this complaint arose was this defendant acting under the color of state

   law? Yes ☑ No ☐ . If your answer is "Yes", briefly explain:

   *He is second in command for the overall operation of each facility under*

   *its jurisdiction, including EDCF, with authority over staff and inmates.*

   (continued  on  page 3)

4) Jurisdiction is invoked pursuant to 28 U.S.C. §1343(3); 42 U.S.C. §1983. (If you wish to

   assert jurisdiction under different or additional statutes, you may list them below.)

   *Invoked pursuant to 42 U.S.C. 1985; 1986: Civil Rights Conspiracy Claims, Declaratory*

   *relief pursuant to 2201; 2202 and injunctive relief pursuant to 2283; 2284*

### B.  NATURE OF THE CASE

1) Briefly state the background of your case:

   _____

   _____

   _____

   _____

   _____

   _____

   _____

   _____

   (continued  on  page 4)

XE-2 8/82                    CIVIL RIGHTS COMPLAINT §1983

2.

## A. Jurisdiction: Continued

Defendant, James Heimgartner, individually and in his official capacity, is the Warden at EDCF and at all times acted under the color of state law. He is legally responsible for the operation of the facility and for the welfare of all inmates of that prison. He is also the supervisor in charge of the (PMC) Program Management Committee at EDCF.

Defendant, Gary Wilson, individually and in his official capacity, who at all times mentioned in this complaint acted under the color of state law as the Classification Administrator at EDCF and a PMC member.

Defendant, Susan Gibreal, individually and in her official capacity, who at all times mentioned in this complaint acted under the color of state law as the Deputy Warden at EDCF and a PMC member.

Defendant, Paul Snyder, individually and in his official capacity, who at all times mentioned in this complaint acted under the color of state law as the Deputy Warden at EDCF and a PMC member.

Defendant, Fred Early, individually and in his official capacity, who at all times mentioned in this complaint acted under the color of state law as the Deputy Warden at EDCF and a PMC member.

Defendant, Dale Call, individually and in his official capacity, who at all times mentioned in this complaint acted under the color of State law as the Compliance Officer at EDCF and a PMC member.

Defendant, Mary Nelson, individually and in her official capacity, who at all times mentioned in this complaint acted under the color of state law as the Deputy Warden at EDCF and a PMC member.

Defendant, Deane Donley, individually and in his official capacity, who at all times mentioned in this complaint acted under the color of state law as the Classification Administrator at EDCF and a PMC member.

Defendant, Maria Bos, individually and in her official capacity, who at all times mentioned in this complaint acted under the color of state law as the Compliance Officer at EDCF and a PMC member.

Defendants, (PMC) Program Management Committee, any and all members past and present unbeknownst to plaintiff, individually and in their official capacity, who at all times mentioned in this complaint acted under the color of state law during the classification decision-making process conducted at EDCF.

Defendants, (ASRB) Administrative Segregation Review Board, any and all members past and present unbeknownst to plaintiff, individually and in their official capacity, who at all times mentioned in this complaint acted under the color of state law during the classification decision-making process at EDCF.

Defendant, Carrie Marlett, individually and in her official capacity, who at all times mentioned in this complaint acted under the color of state law as the Unit Team Manager at EDCF and an ASRB member

Defendant, Timothy Randa, individually and in his official capacity, who at all times mentioned in this complaint acted under the color of state law as the Segregation Lieutenant at EDCF and an ASRB member.

Defendant, Connie Zabel, individually and in her official capacity, who at all times mentioned in this complaint acted under the color of state law as the Clinical Staff at EDCF and an ASRB member.

Defendant, Brandon Walmsley, individually and in his official capacity, who at all times mentioned in this complaint acted under the color of state law as the Unit Team Manager at EDCF and an ASRB member.

Defendant, Roland Buchanan, individually and in his official capacity, who at all times mentioned in this complaint acted under the color of state law as the Segregation Lieutenant at EDCF and an ASRB member.

Defendant, Matthew Moore, individually and in his official capacity, who at all times mentioned in this complaint acted under the color of state law as the Corrections Counselor II at EDCF and attended the ASR.

Defendant, Katherine Clouser, individually and in her official capacity, who at all times mentioned in this complaint acted under the color of state law as the Clinical Staff at EDCF and an ASRB member.

### B. Nature Of the Case: Preface Of Facts

On August 4, 1996 Grissom was placed in (LCF) Lansing Correctional Facility (ad seg) administrative segregation under pending investigation status into illegal activity (exh. A4). A known drug addict inmate and (CI) confidential informant, John Teters, alleged that Grissom was trafficking drugs and extorting and threatening him to pay for said drugs. LCF (I & I) Intelligence and Investigations froze Grissom's account containing less than $18 for over a year to investigate his banking transactions. It was determined that all of Grissom's account credits had originated from either prison wages for working as a porter, or from leathercraft sales to prison staff through the prison's craftstore. The CI alleged that Grissom, albeit he was housed in a different cellhouse, had thrown water on the CI's cell floor in an endeavor to electrocute him, which is absurd and impossible due to modern day circuitry. The CI also alleged to I & I that Grissom's alias was "T" Money which supposedly means Take Money, obviously in an endeavor to support the extortion allegations. It is a well-known fact even by cellhouse staff that Grissom's alias has always been "G" Money, which has even been published as such in the Wichita Eagle and other local newspapers, so clearly the CI did not truly even know Grissom and was providing false information that I & I was erroneously reporting to be factual. Nineteen plus years later, these aliases are still being displayed as veracious facts on Grissom's Kasper Internal KDOC - Offender Population Search (exh. A1). Said CI has an extensive history of repeatedly making similar unreliable allegations against other inmates in a desperate need to exchange fabricated information for favors from prison officials that includes, but not limited to, intra.state and interstate transfers in an endeavor to flee from self-induced drug related problems.

On October 28, 1996 I & I issued a report stating that Grissom had been "identified" as a key partici-

4.

pant in the distribution and sales of drugs at LCF, and that his status was changed from pending investigation to (OSR) Other Security Risk. Grissom did not understand what this meant so he asked (UT) Unit Team Shipman to explicate it. UT Shipman informed Grissom that the report was for "status change only" (exh. A5), that no (DR) disciplinary report was ever issued and that he would return to (gen pop) general population once all the paperwork was processed. UT Shipman even instructed Grissom under pretext to reduce the amount of property he possessed because he would be released to gen pop within the next couple of days. It was all a ruse and a blatant lie. On December 31, 1996, Grissom was the only passenger on the otherwise empty bus and was surreptitiously transferred without a hearing to (EDCF) El Dorado Correctional Facility long-term ad seg unit, aka: Supermax.

Grissom's ad seg Placement Facts stated that he "was identified as a key participant in the distribution and sales of drugs at LCF". Prior to these allegations, Grissom was housed in gen pop for 6 plus years, considered to be a model inmate, participated in the award winning "Choices" high school drop-out prevention video, had never received a DR for violating any prison rules, and had never been associated with drugs as a user, distributor, seller, enforcer or in any capacity throughout his entire lifetime. Inmates housed in (KDOC) Kansas Department Of Corrections can receive a DR for simply having their shirttail not tucked into their pants and it requires very little evidence to write-up an inmate for a rule infraction, but Grissom never received a DR, verbal reprimand nor was he ever charged with committing any crime germane to the allegations of extortion or drug trafficking. Due to the serious nature of the allegations, if Grissom was indeed guilty or had even met the "some evidence standard" then one must question why didn't the KDOC take this opportunity to sanction him by issuing a DR? KDOC could've issued a DR for any of the following rule infractions; (44-12-306) Threatening or Intimidating Any Person; (44-12-206) Debt Adjustment or Collection Prohibited; (44-12-205) Unauthorized Dealing and Trading; (44-12-1101) Attempt, Conspiracy, Accessory, Solicitation, Liability for Offenses of Another; (44-12-901) Dangerous Contraband; (44-12-1001) Violation of Statutes, Other Regulations or Orders; (KSA 21-3826) Trafficking in Contraband into a Correctional Institution, and etc. One must consider that on April 7, 2010 Grissom did receive a DR for Less Dangerous Contraband because the water in his hot pot exceeded the temperature allowed, therefore on the premise of guilt, one must conclude that since he never received a DR for the aforementioned Placement Facts that KDOC must believe that the hot water violation to be more egregious than extortion or drug trafficking. Grissom was never indicted, nor convicted in connection with extortion or drug trafficking in any court or through the prison's disciplinary procedures, which has the lowest possible standard of review, "some evidence standard", yet he is still being unfairly judged as if he was convicted and found guilty of the aforementioned Placement Facts for 19 plus years.

In March 1997 Grissom attempted to file a grievance germane to his Placement Facts because he had never received a hearing or the opportunity to confront the allegations or witnesses against him, but (UTM) Unit Team Manager Les Derstein returned his grievance as being invalid and informed him that no DR was ever issued; that his ad seg placement was a classification decision process which can't be grievanced under KAR 44-15-101a(2). After perusing said KAR and being ignorant of the law, Grissom had no knowledge that he could continue litigation so he did not pursue the grievance beyond unit team level.

In May 1997 Grissom overheard staff that his ad seg placement was "politically" motivated due to public pressure being directed at KDOC Topeka Central Office demanding that he be housed in the severest environment available as "punishment" for his convictions and hoping that the harshness of confinement would force him to discuss his case with authorities. This sentiment was reported in the Kansas City Star, Wichita Eagle and other local newspapers. Grissom attempted to obtain verification of the staff's comments germane to the veracity behind his ad seg placement by contacting I&I, but Lt. Barnes responded, "I cannot and will not address your allegations of officer's having conversations about you. As you must well know, I will not discuss information that may or may not be in the possession of this investigative unit concerning you", (exh. A6). Since I&I refused to deny or verify staff's comments, Grissom had no other alternative but to drop the issue as being unresolved.

Between 1997 to 1999, Grissom was visited by detectives from Johnson County where he was convicted. They possessed childhood photos belonging to Grissom and initially claimed that the reason for their visit was to return the said photos to him. After displaying the photos on the table, the detectives attempted to question Grissom germane to facts of his case and in return they would secure his release from ad seg. But Grissom invoked his right to have an attorney present so the detectives took back the childhood photos and left. Several months later the detectives from Johnson County returned with said photos and distributed them to Grissom up-front as a display of good faith. The detectives reiterated their previous offer to secure his release to gen pop if he would answer some questions germane to the whereabouts of Marcelais Thibodo and identify the individuals in some photos they possessed. But Grissom again refused to comply without his attorney present so the detectives left in a huff. One must consider that if the Johnson County detectives possessed the ability to secure Grissom's release from ad seg in exchange for his cooperation, then surely it's reasonable to presume that the detectives also possessed the ability to retain him in ad seg for refusing to cooperate or until such time he concedes.

The (PMC) Program Management Committee submits a 120-day placement review and the (DW) Deputy Wardens have repeatedly stated in their recommendations that one of the reasons for continued segregation was that Grissom had a "high profile case" and in one instance even stated "While on parole he kidnapped and murdered three people" (exh. A7-9). It is articulated in their own words that Grissom's state convictions is a premise behind his ad seg placement, which supports the aforementioned comments made by staff that I&I refused to address. Grissom has been informed repeatedly from the outset by each of his Unit Team Managers in the past that his continued segregation is germane to negative opinions from the upper administration about his state convictions, even to this date.

On October 19, 2000 Grissom's ad seg status was changed from Other Security Risk to Escape Risk and his placement facts were amended to state, "The additional status is the result of a written correspondence from an outside source being intercepted by EDCF I&I. Within the correspondence the writer indicated the desire to get Inmate Grissom out of prison once he was released to general population. EDCF I&I has determined this information expresses a potential for escape and poses a serious risk to the facility." (exh. A10). It is of the utmost importance to note that Grissom was never implicated of any wrongdoing and that someone from the free world on the "outside" is the culprit who authored and

6.

mailed said correspondence to him, but KDOC once again is sanctioning Grissom as if he was the guilty party. Since 1996, Grissom was on the "readable mail list" and was well aware that all of his incoming mail was thoroughly being examined by I&I prior to its distribution to him, so obviously he had no idea that anyone would be so clueless to write something to him that could jeopardize his situation. Grissom did not even truly know the author very well because they had only just commenced corresponding less than 3 months earlier. EDCF clearly abused their authority by violating their own policy and procedures in an exaggerated response to hold Grissom responsible and by punishing him for the senders actions. It is vividly articulated that EDCF General Order 16-102 V Readable Mail List and Inspection for Contraband "A. "Responsibility for the content of the letters and packages rests with the sender." (exh. A11). At the time of this incident Grissom had progressed to the highest level of freedom one could achieve while in ad seg as an unrestrained floor porter due to his exemplary behavior, (exh. A12). This afforded Grissom the ability to come out of his cell whenever he needed to work without handcuffs or being escorted around by officers, but he was fired and placed under Extreme Escape Risk, despite once again never receiving a DR for any wrongdoing. Grissom was never allowed to view said correspondence or peruse the portion in question to determine the veracity of the allegations. Grissom exhausted his administrative remedies but wasn't able to procure an attorney willing to represent him pro bono, and being ignorant of the law he declined to pursue further litigation. EDCF staff informed Grissom that the upper administration of Topeka Central Office was upset that they had allowed him to progress as far as he did because they wanted to retain him in ad seg so they were going to utilize the correspondence incident to justify continued confinement. On January 6, 2003 Grissom's Escape Risk Status was revoked and it was changed back to OSR, (exh. A13). To this date, Grissom is still being held accountable, unfairly judged and punished for somebody else's actions contrary to their own protocol.

On June 14, 2001 EDCF I&I Lt. M.K. Barnes issued a report prohibiting Grissom from using the telephone system by alleging that it was due to illegal and unauthorized use between him and Heather Van Wyk. This was another spurious report because Van Wyk had done absolutely nothing wrong except deprive KDOC of long distance phone call kickbacks. Van Wyk was being charged an exorbitant fee of $60 per hour to receive collect calls from Grissom so she changed her long distance carrier to one that only charged her $5 per hour and Lt. Barnes claimed it was illegal and unauthorized. This type of cheaper long distance service from prisons is now ubiquitous and definitely not illegal, but for reasons only known to him, Lt. Barnes clearly wanted to punish Grissom and terminated his phone privileges for over a year. Once again Grissom did not receive a DR because he had not violated any rules, but once again he was still being punished and judged negatively based on spurious justifications. On the issue of kickbacks, it must be noted that EDCF Warden Michael A. Nelson and I&I Lt. M.K. Barnes were both forced to resign shortly after this due to numerous allegations of corruption germane to finances so they were never held accountable or suffered any consequences for their unscrupulous actions.

On November 25, 2003 Grissom received his first DR ever and it was a Class I, (the most severe) for possession of a cellphone. Grissom is not attempting to condone or justify his actions, but when Lt. Barnes took away his phone privileges for spurious reasons, that's when he decided to violate prison rules. On Janu-

ary 26, 2005 and again on June 1, 2005 he received another Class I DR for Dangerous Contraband, cellphone possession. Five years later on April 7, 2010 Grissom received his fourth and last DR to date because the water in his hot pot exceeded the temperature authorized and it was a Class 2. During his 26 years plus of incarceration he has only received the total of 4 DR's which is exceedingly way below the average, especially for an ad seg inmate, (exh. A3). Grissom was issued 4 DR's for 4 separate rule violations that met the some evidence standard, which is the lowest standard of review, but oddly enough he never received a DR for any of the allegations of extortion, drug trafficking, escape risk or illegal use of the telephone and one must question the validity and onus behind these Placement Facts. Once an inmate is accused of something, it is permanently recorded on his file regardless of its accuracy, the standard of proof, or spurious justifications and he is forever judged accordingly in a negative light.

## Statement Of Supporting Facts

Grissom has attended well over 120 (ASR) Administrative Segregation Review's that are held every month, which far exceeds the attendance of any other inmate by an enormous margin. The (ASRB) Administrative Segregation Review Board consists of the (UTM) Unit Team Manager, Segregation Lieutenant and a Clinical Staff member. The ASRB is supposed to review the seg inmates cellhouse chrono files, prison files and progress reports to make the determination whether or not to recommend him for release to the (PMC) Program Management Committee for final approval, (exh. B1). The PMC consists of any 3 of the following members : (CO) Compliance Officer, (CA) Classification Administrator, (DWO) Deputy Warden of Operations, (DWSS) Deputy Warden of Support Services, (DWP) Deputy Warden of Programs or the Warden, (exh. B2). Once the inmate has been recommended for release by the ASRB, the inmate must receive the written approval of any combination of 3 PMC members to officially be released, but the Warden has the authority to override any decision and his decision is final. Once the seg inmate has obtained the approval for release from the PMC, he is then placed into the (BMP) Behavior Management Program and upon completion, he is released to gen pop.

Over the past 3 years plus, Grissom has not missed a single ASR and has requested to be released from ad seg every time verbally or in writing to no avail. The ASRB has informed him in the past that there was no need for him to attend subsequent ASR's for a specific period of time (e.g. 6 months, 1 year, etc.) because they had no intentions of recommending him for release until such time and attendance prior to that time would be futile, (exh. B3). EDCF General Order 10-102 III.B. 3 "Inmates shall not be required to attend hearings scheduled by the Board.". Therefore it is not mandatory nor is it a prerequisite for an inmate to attend his ASR's to receive recommendation for release, but it is common for the PMC to capriciously state, "Needs to attend monthly seg reviews" as a reason to deny approval, (exh. B8). Contrarily, Grissom has observed numerous ad seg inmates who rarely, if ever, attend any ASR's yet they were still approved and released, which is an example of arbitrary decision-making. When the ASRB is ready to release an inmate who never attends his ASR, a Board member or other staff will go to the inmate and instruct him to attend his next ASR.

On the third Monday of each month the ASR's are conducted in the unit teams office. UTM Walmsley usually states, "You know where we stand and I'll write down that you want out of seg." From the out-

8.

set UTM Walmsley informed Grissom that the ASRB would normally recommend him for release but it would be a waste of time and paperwork, because the PMC has already informed them that they would oppose his release, so the ASRB would not be submitting him for release until such time they are instructed to do so by the PMC. This decision by the ASRB departs from IMPP protocol, IMPP 12-136 II, Behavior Management Program B.2. "The Administrative Segregation Review Board will make recommendations to the PMC for placement approval or denial." The same decision not to recommend Grissom until the PMC instructs them to do so, originated on November 25, 2013 by then ASRB UTM Marlett, Lt. Randa and Clinical Staff Zabel due to numerous denials and instructions by the PMC for them to stop recommending him for release, (exh. C8). Therefore by the ASRB's decision to depart from official protocol, such action should be viewed as arbitrary or an abuse of discretion, which renders his ASR's to be perfunctory and meaningless. UTM Marlett, Lt. Randa, Clinical Staff Zabel, UTM Walmsley, Lt. Buchanan and Clinical Staff Clouser were all ASRB members who knowingly, willfully and intentionally made the conscious decision not to treat Grissom equally by refusing to recommend him for release and exhibited deliberate indifference to his Due Process and Equal Protection Rights.

Whenever Grissom has requested a list of written guidelines or set of criteria from the ASRB or the PMC that'll promote him towards release, he's always been informed that there aren't any and to "Keep doing what he's doing," (exh. B9-10). Under these circumstances, simple fairness requires that the rules be written and that they adhere to objective criteria by which the PMC or ASRB can gauge the progress of an ad seg inmate. Grissom has addressed the lack of criteria in the past and complained to then Warden Roberts to no avail, (exh. B3). If there aren't any specific set of guidelines in writing that guarantees progression towards release, then the classification decision-making process is the epitome of arbitrary state action that's forbidden by the 14th Amendment and constitutes an atypical significant hardship which was executed by SOC Roberts, Warden Heimgartner, DW Gibreal, DW Snyder, DW Early, DW Nelson, CA Wilson, CA Donley, CO Call, CO Bos, UTM Marlett, UTM Walmsley, Lt. Randa, Lt. Buchanan, Clinical Staff Zabel and Clouser and violated Grissom's federally protected rights and his Due Process and Equal Protection Rights.

Another capricious suggestion once recommended by the PMC for Grissom to accomplish was "Work with staff on programs," (exh. C11). The only program that's available to him is the aforementioned BMP and the PMC possesses sole authority to approve him for release to said program. Mental health does offer self-help courses that are not a prerequisite for release but UTM Marlett and other past ASRB members have informed Grissom that there was no need for him to partake in them because it had no relevance on his continued segregation. Regardless of its futility, Grissom took the initiative to convey his willingness to do whatever is required to progress towards a more favorable placement for release by completing 2 self-help courses and obtained certificates of achievement, (exh. B11-12).

Because there are no written guidelines, criteria, or programs for the ASRB to provide Grissom to progress out of ad seg and since their minds have already been formulated not to recommend him for release, the total time it takes to complete his monthly ASR is usually one minute or less in duration. Grissom has addressed his meaningless seg reviews conducted in a hasty perfunctory manner to Warden Rob-

erts and Warden McKune in the past to no avail, (exh. B3-7). On January 26, 2015 Grissom along with 2 other seg inmates separately recorded just how long each ad seg inmates ASR actually took to complete. There are 64 cells in Grissom's cellhouse and albeit many inmates refused to participate in their ASR, there were 29 in attendance on this date. Each inmate is escorted to the UTM office and once the door closes it takes approximately 5 seconds for the inmate to be seated, and once they're finished with the ASR it can take between 10 to 30 seconds for an escorting officer to retrieve the inmate. In an endeavor to maintain consistency, Grissom started recording the time once the UTM office door closes behind the inmate after he has entered the UTM office, and stops recording the time once the UTM office door opens for the inmate to exit the ASR. There were 9 inmates whose ASR took less than 1 minute and 10 inmates whose ASR took less than 2 minutes to complete, (exh. B13-15). It took the total combined time of 21 minutes 5 seconds to conduct 19 inmates monthly seg review, and this includes the time they took to be seated and the time they waited by the door for an escorting officer. Simple arithmetic leads to the conclusion that it's absolutely impossible to conduct a meaningful ASR within such a tiny amount of time and believe that it truly satisfies the standard stipulated by the U.S. Supreme Court. The ASR conducted on January 26, 2015 commenced at 9:18:59 am and ceased at 10:33:54 am which is about the normal amount of time it usually takes to complete seg reviews in C cellhouse. But on March 16, 2015 the ASR commenced at 9:04am and ceased at 9:39am, which was exceedingly quicker than normal and the staff boasted openly how expeditiously they were completed, (exh. B16). Grissom's ASR's that are conducted under the auspices of the ASRB cannot be considered as being "meaningful" and should be deemed a hollow formality. UTM Marlett, Lt. Randa, UTM Walmsley, Lt. Buchanan, Clinical Staff Zabel and Clouser knowingly, willfully and intentionally conducted hasty perfunctory meaningless monthly seg reviews exhibiting deliberate indifference to purposefully deprive Grissom of his Due Process Rights."

The past Secretary of Corrections William L. Cummings, who creates KDOC policy, responded to one of Grissom's past grievances and stated, "At such time that it is determined that an inmate no longer poses a threat to the security of the facility, a recommendation for his release from administrative segregation will be made." Therefore one must conclude that when the ASRB and the PMC recommended Grissom for release, then they made the determination that he no longer posed a threat to the security of the facility and that the Placement Facts become moot and can no longer be utilized as a premise to continue segregation. Yet, in-between the months that the ASRB did not recommend Grissom for release they would revert back to citing that the Placement Facts still existed, despite the fact that he had done absolutely nothing wrong to regress or warrant the ASRB's refusal to continue recommendations for his release, (exh. D1-9). The same must be considered when DW Paul Snyder and DW Fred Early, both PMC members, in April 2013 approved Grissom for release to the BMP, (exh. E1), but since then have cited Placement Facts as the reason to subsequently deny release. DW Snyder, DW Early, UTM Marlett, Lt. Randa and Clinical Staff Zabel, knowingly, willfully and intentionally under pretext, arbitrarily cited rote reiterations of stale justifications to continue segregation and deprive Grissom of his Due Process Rights which is forbidden under the Fourteenth Amendment.

In further support of the above facts, on March 24, 2014 Grissom attended his ASR and inquired, "Please tell me how the inmates involved with killing a guard by crushing his skull, the ad seg inmate who stab-

bed another ad seg inmate over 25 times, (exh. E1-2); the ad seg inmate who took a guard hostage with a razor wanting his keys, (exh. E3-4); are all now in general population and did less than 5 years in ad seg or in all cases did less time than me.? How is "this justified?" The entire ASRB weighed in with support on Grissom's behalf but the official response was provided by UTM Marlett, "We can't really give you a valid explanation and can't justify it," (exh. C12). On April 21, 2014 Grissom attended his ASR and inquired, "Can you give me a legitimate reason why I'm still in ad seg?" UTM Marlett stated "No we can't," and Lt. Randa concurred, (exh. C13). On June 23, 2014 Grissom inquired, "In all of my Seg Review responses, it states "Placement Facts still apply." How is this possible after 18 years in ad seg?" UTM Marlett responded, "They don't apply, and that's why we keep recommending you for release," and Lt. Randa concurred, (exh. C15). On August 19, 2014 Grissom attended his ASR and inquired, "Since there are no legitimate reasons why I'm still in ad seg and the Placement Facts no longer exists, can you tell me why the PMC continues to deny my release and why they discourage you from recommending me for release?" UTM Marlett responded "No and No!" The reasons for segregation must not only be valid at the outset but they must continue to subsist throughout the period of segregation. Albeit he has made numerous inquiries in the past, the ASRB has repeatedly failed to provide him with any legitimate reasons or justifications for his continued segregation, and since there have been more than 20 ASR reports recommending his release, it's vividly apparent that Grissom truly does not pose a threat to the security of the facility. Due to the specificity of Grissom's inquiries and the ASRB responses, UTM Marlett, Lt. Randa and Clinical Staff Label arbitrarily continued his excessive segregation that bores no rational relation to any legitimate penological interests and is clearly an abuse of discretion that exhibits callous indifference to his federal protected rights of the Fourteenth Amendment.

A thorough examination of Grissom's ASR reports would reveal that many of the reports are virtually identical from month to month as if they're rubber-stamped and there are no signatures, especially the most recent ones, (exh. C21-27). The fact that all of his ASR's are perfunctory, meaningless, rote reiterations of stale justifications and the decision-making process is conducted arbitrarily, this gives rise to and supports Grissom's claim that his continued segregation is excessive and is being utilized under pretext for "indefinite" confinement which constitutes an atypical significant hardship and violates his liberty interests.

Grissom has been confined in KDOC ad seg continuously for 19 years plus which is shockingly disparate when compared to the duration of all other Kansas ad seg inmates that's similarly situated. What's even more compelling is when you compare Grissom's seg duration to that of a White seg inmates average duration which is 2years 9months, (exh. F1). Due to his limited ability to obtain statistical data to support his claims, Grissom will compare the racial disparity germane to the BMP which is conducted in his cellhouse for ad seg inmates who have been approved for release by the PMC. This should illustrate the questionable decision-making process the PMC utilizes to arbitrarily determine who they'll approve for release. As of August 1, 2015 there were 11 seg inmates currently participating on Step2 of the BMP and there's 11 other seg inmates scheduled to commence step1 in October 2015 and 1 seg inmate scheduled for the April 2016 BMP, (exh. F1). Albeit the minorities make up more than 62% of the inmates housed in ad seg, only 4 Black inmates have been approved for the October 2015 BMP compared to

6 White inmates that's been approved. There are 3 Black seg inmates who have been confined for 10 years plus (11y 8m, 10y 7m, 10y 1m) compared to 1 White seg inmate with the longest duration of 6 years 4 months and another White seg inmate with 5 years 3 months and all of the remaining White seg inmates have been confined less than 3 years each. The average duration the Black seg inmates were confined in segregation was 5 years 6 months, compared to 2 years 9 months average for the White seg inmates which equates to the White seg inmates being confined 50% less in duration than the Black seg inmates. Now compare these statistics to Grissom's 19 years plus of continuous segregation and the disparity is overwhelmingly perplexing. One must consider that as the length of segregation increases, prison officials burden of justification for continued segregation also increases. Grissom has been confined in segregation excessively longer than any other Kansas inmate surpassing 19 years plus, and the duration and degree of his restrictions compared to other seg inmates similarly situated is extremely disparate, which in itself constitutes an atypical significant hardship violating his liberty interest, Due Process and Equal Protection Rights.

In support of the above facts, there are currently 360 inmates confined in EDCF's segregation and they possess the combined total amount of 14,471 DR's which averages out to 40.2 DR's per inmate, which far exceeds Grissom's DR total of 4. If you compare Grissom's 4 DR's to the total combined average of DR's the White seg inmates who were recently approved for the BMP, which is 28.0 DR's, again the disparity is obvious. When it comes to the total number of Dangerous Contraband violations, Grissom possesses 2 total compared to the combined total average number the White BMP seg inmates which is 3.2 and it should be noted that 5 of them possessed 7, 5, 5, 4, 4 Dangerous Contrabands respectively. Another example of the PMC's racial discrimination and arbitrary decision-making is when they intentionally ignored the multiple Class 1 DR's (the severest) a White seg inmate had received prior to, during and after their approval to release him in October 2011. Just 10 months earlier on December 5, 2010, the White seg inmate received 3 counts of Battery on an officer in addition to 2 other Class 1 DR's, (exh. E 14). In September 2011 he received a Class 1 DR for Trafficking in Contraband (methamphetamine) and 6 days later he received another Class 1 DR for Violation of Published orders in the same month that he was recommended for release by the ASRB. A month later in October 2011 he was approved for release by the PMC and was moved to C cellhouse to await the next BMP scheduled to commence in April 2012, and upon arrival he received yet another Class 1 DR for Obscenity. Within a 10-month period he had received 12 Class 1 DR's but the PMC approved him for release and at no time did they revoke their decision. This White seg inmate possessed 5 Dangerous Contrabands, 1 Trafficking in Contraband, 1 Tobacco Contraband, 4 Less Dangerous Contrabands, the total of 54 Class 1 DR's and the total of 118 DR's within 7 years 6 months of incarceration, (exh. E 14-17). If you compare this to Grissom's DR history of 4 total within 26 plus years of incarceration, then the disparity has achieved the level of egregiousness. One must also consider that Grissom's last DR for Dangerous Contraband transpired over 10 plus years ago and the last DR to date occurred over 5 years ago for his hot pot water exceeding the temperature allowed. The PMC also exhibited arbitrary decision-making when they approved another White seg inmate who possessed 4 Assaults on an Officer, 9 Battery on an Officer, 153 Class 1 DR's and 318 total DR's within 18 years of incarceration, and he was released within 4 months of his last battery, (exh. E 5-12). One must also consider the White seg inmate aforementioned who was a porter in ad seg and decided to stab another ad seg inmate over 25 times, adding to his 4 Dangerous Contrabands, 17 total Class 1 DR's and 27 total DR's, (exh. E 1-2). Then the other aforementioned White

12

seg inmate who took a Black guard hostage with a razor blade in the shower in an attempt to obtain the cell-house keys and he possessed 4 Dangerous Contraband's, 26 total Class I DR's and 38 total DR's within 7 years 5 months of incarceration, (exh. E3-4). The only reason Grissom possessed the Knowledge of the White seg inmates listed above is due to the fact they were all once neighbors of his in the past and they were all released to gen pop while he continues to remain in ad seg. Grissom would've been able to provide additional definitive proof but the facility mailroom had seized several different envelopes that contained downloaded "pub-lic" information off of the prison's website, Kasper, and cited that it was "Another offender's face sheet" (exh. F9). There are innumerable additional examples of racial discrimination and arbitrary decision-making that the PMC have executed so these few cases should be viewed as a small illustration and not as an ex-haustive catalog. The racial disparity and preferential treatment that's being afforded to White seg in-mates by an all White PMC is vividly apparent and must be viewed with strict scrutiny that the sophis-ticated as well as simple minded modes of invidious racial discrimination and bigotry must be address-ed by the Court and eradicated. PMC members Warden Heimgartner, DW Gibreal, DW Nelson, DW Early, DW Sny-der, CA Donley, CA Wilson, CO Call and CO Bos Knowingly, willfully with malicious intent conspired to deprive Grissom of the protections of the Due Process and Equal Protection Clauses and they exhibited callous in-difference to his liberty interests and Civil Rights, under the 14th Amendment of the US Constitution.

Grissom has been informed repeatedly by unit teams in the past that he must remain DR free for a specific amount of time, such as a year or 18 months, but this is another false fabrication and an unwritten guide-line used as a tool for arbitrary treatment, (exh. B3). On June 2, 2014 a White seg inmate in A cellhouse was visited by (DSFM) Deputy Secretary of Facilities Management Johnnie Goddard, Warden James Heimgartner and Seg Lieutenant Timothy Randa. DSFM Goddard informed the White inmate, who had been confined in ad seg approximately 7 years, that it was his intention to release inmates who have been housed in segregation for long periods of time, and that he would make sure that said White seg inmate would be transferred to the gang program as soon as space became available. On April 3, 2014 just 2 months earlier, this White seg inmate had received his third Dangerous Contraband, which clearly contradicts any stipulations that an inmate must remain DR free for any specific amount of time, (exh. E13). When Seg Lt. Randa made the suggestion to DSFM Goddard and Warden Heimgartner that they needed to visit C cellhouse and dis-cuss the same proposition to Grissom because he had been confined in ad seg excessively longer than any other Kansas inmate, they both declined any interest. Seg Lt. Randa on June 23, 2014 informed Grissom during his ASR of the above facts and openly expressed his disappointment that DSFM Goddard was not affording him with the same consideration being provided to other long-term segregation inmates. When the White seg inmate moved to C cellhouse shortly afterwards, he corroborated Lt. Randa's account of what transpired. Just because DSFM Goddard is from Topeka Central Office and is second in command, it doesn't absolve him from executing his decisions free of bias or arbitrariness. DSFM Goddard and Warden Heimgart-ner Knowingly, willfully and intentionally conducted arbitrary decision-making that exhibited preferen-tial treatment and racial discrimination by not treating him equally compared to other inmates similarly situated and deprived him of the protections afforded by the Due Process and Equal Protection Clause and violated Grissom's liberty interests.

The following statements made by (CCII) Corrections Counselor II Matthew Moore verifies and proclaims that

13.

racist attitudes and racial discrimination practices truly exists within the upper echelons of KDOC administration. On December 4, 2014 at approximately 10:28 am CCII Moore was conducting his daily morning rounds talking to inmates and returning their KDOC paperwork. CCII Moore was at cell 142 which is directly underneath Grissom's cell 246 and due to the fact that it was during the morning hours the cellhouse was extremely quiet so any conversation could easily be overheard. Black inmate Glynn in cell 142 inquired, "I'm not a troublemaker, why can't I get out?" CCII Moore responded articulately, "Because you're Black!" Inmate Glynn exclaimed, "What?" CCII Moore answered, "At least I'm being honest." This conversation was witnessed by several seg inmates, of which 3 were White, and the inmates who weren't afraid of possible staff retaliations submitted their signed Declarations, (exh. F2-7). It must be noted that all of the witnesses who submitted Declarations have subsequently been released from ad seg or approved for release, with the exception of Grissom. CCII Moore not only attends each monthly ASR but his lateral equivalent rank is that of a lieutenant so he is privy to the intimate operations of EDCF's upper administration and is cognizant of the racial discrimination that's taking place within their inner sanctum. If you thoroughly peruse inmate Glynn and inmate Logsdon's Declarations you'll notice other modes of racial discrimination being revealed that we've all been subjected to or witnessed. Many Black seg inmates have experienced other forms of racism but are afraid to complain because they want out of seg and they've witnessed how Grissom has been treated by the administration so they want to avoid their wrath and not be confined for 19 plus years. Recently, however, there were 2 Black seg inmates willing to share their bouts with racism, so they'd forwarded their signed Declaration of facts to an older religious couple associated with Grissom to have copies made. But when the original Declarations and copies were mailed to Grissom to include in his complaint, the facility mailroom seized them and cited "The mail is unauthorized correspondence between offenders," (exh. F10). Albeit Grissom argued that the material was not correspondence but legal Declarations of facts to be utilized as evidence, it was to no avail. Grissom requested for the Declarations to be returned to sender but the seized material "mysteriously" disappeared in transit and was never received by the sender. A and B cellhouses are more restrictive than C cellhouse where Grissom is currently housed. When a Black or Latino seg inmate housed in C cellhouse receives a DR, he is moved immediately back to A or B cellhouse, whereas when a White seg inmate housed in C cellhouse receives a DR, he usually remains in C or is moved to the other side to C2. UTM Walmsley and CCII Moore are responsible for making cell assignments and C cellhouse moves which appears to Grissom and other Black seg inmates as being racially motivated. UTM Walmsley has made it known to numerous Black and Latino gang members that he does not like them and has made statements to that fact during their ASR. Gang members, both Black and Latino, have made repeated complaints that once they have been approved for release to the gang program (SMU) that they must wait several months or even beyond a year before they are transferred whereas a White gang member is usually transferred to SMU within less than a month. Black gang member Logsdon had to file a grievance before he was finally transferred, (exh. F7). UTM Walmsley has informed Black and Latino gang members that they must attend the SMU gang program to be released whereas most White gang members, especially White supremacist, are allowed into the BMP and do not have to go through SMU. In fact, there are 4 White Supremacist scheduled to attend the next October 2015 BMP. It is also well known that UTM Walmsley segregates whichever cellhouse he is assigned to immediately upon arrival by purposefully segregating the inmates cell assignments to pre-

14.

vent 2 Black inmates from living side by side as neighbors. Currently Grissom is housed in 246 and on his left in cell 244 is a Latino and on his right in cell 248 is a White inmate but additional evidence can be viewed in, (exh. F13). Less than a week after Grissom had filed a grievance germane to CCII Moore's December 4, 2014 comment "Because you're Black!" he witnessed a verbal exchange between inmate Logsdon and CCII Moore, that proves that the grievance procedure is not a deterrent to stop racial bigotry. On May 7, 2015 at approximately 8:40am Grissom overheard inmate Logsdon state "Did the sheriff serve you with those papers?" CCII Moore inquired, "What papers?" Inmate Logsdon responded, "For kidnapping me and not releasing me to the gang program." CCII Moore responded quietly, "You can't Kidnap Black people!" (exh. F8). Grissom is cognizant that CCII Moore's statement was in response to inmate Logsdon's failed attempt at humor, but it was still derogatory and racist. CCII Moore's comment is akin to the outset of slavery when Blacks were taken from their homes in Africa and the Whites possessed the belief that Blacks were not considered to be "people" so it was justified to enslave them... ergo, "You can't Kidnap Black people!" Grissom cannot state with any certainty to the actual meaning behind CCII Moore's comments, but regardless it was racist and totally uncalled for. Inmate Logsdon's comments were completely devoid of any racist undertones yet CCII Moore's response was quick witted which exposed the racist beliefs he truly possesses within his consciousness. It is vividly apparent that racist attitudes and racial discrimination is prolific within KDOC and it's indicative of the beliefs and opinions shared by many administrative staff at EDCF and Topeka Central Office, UTM Walmsley and CCII Moore, Knowingly, willfully and with malicious intent perniciously exhibited racist beliefs and acts of racial discrimination to deprive Grissom of his Civil Rights and protections afforded by the 14th Amendment.

The racial composition of EDCF's upper administration whom also serves as members of the PMC during Grissom's entire duration of ad seg confinement since 1996 to the present have consisted of an all White staff, (exh. F11-12), Grissom was unable to confirm with absolute certainty, but was informed by staff, that the upper echelons of KDOC Topeka Central Office which includes the Secretary of Corrections, Deputy Secretary of Facilities Management and Corrections Manager/Risk Management have also consisted of an all White staff dating back as far as anybody knows of. KDOC's current practice is to classify the Latino inmate population as being "White" instead of affording them their own rightful racial classification which distorts the true racial makeup on the surface, not to mention that such erroneous classification is in itself an example of racial discrimination, (exh. I 1-10). Grissom has never met a single Latino inmate who was at all pleased with being classified as White, especially when they're categorized so negatively with gang activity by prison officials whenever it suits them. For the purposes of this complaint, Grissom is including the Latino demographic as being non-White, which means that more than 62% plus of the inmates housed in ad seg are minorities and must be considered the majority, (exh. E18-26). The top security positions at EDCF are CSII-Lieutenant, CSIII-Captain and the Major. There are currently 20 top security positions available and it's Grissom's contention upon information and belief that CSIII Guidachay is the only minority to hold that position which equates to a 95% White top security staff, (exh. F14). The unit team counselors at EDCF consists of CCI-Corrections Counselor I, CCII-Corrections Counselor II and UTM-Unit Team Manager and they're responsible for the everyday classification decision-making process of inmates and considered to be the lower half of the administration that's utilized as a stepping stone towards the progression into the upper PMC

administrative positions. There are 35 available unit team positions and it's Grissom's contention upon information and belief that CCII Perkins and CCII Pyles are the only minorities to hold that position which equates to a 94.3% White unit team counselor staff, (exh. F15). If one truly scrutinizes EDCF's administrative advancement practices, it is apparent that throughout the last 20 years they have consistently promoted White gay staff to the top 6 PMC administrative positions, which they should be commended for. There were times that 3 of the top 6 EDCF PMC administrative positions were held by White gay staff so it's obvious that they are proponents in the advancement of gays, (exh. F12). But if EDCF can advocate to maintain at least 2 White gay staff in the upper PMC administration for 17 plus years, then where is the equal effort being applied to promote the advancement and hiring of Blacks or Latino's to the top 6 administrative PMC positions at EDCF? or the lower 35 administrative unit team positions? or the top 20 security positions? or even the lower 320 plus security positions? Obviously there's an enormous racial disparity between the 100% White PMC administration, the 94.3% White lower administration, the 95% White top security positions and the 62% plus minority seg inmates, which violates Grissom's Due Process and Equal Protection Rights and his Civil Rights Statutes.

Grissom is currently serving 4 life sentences after being convicted with circumstantial evidence in Kansas of 3 counts of first-degree murder, 1 count of aggravated kidnapping, 4 counts of robbery and 2 counts of aggravated burglary. The individuals that he was convicted of murdering were White and their bodies were never discovered, which elicited strong adverse feelings of animosity, especially within the affluent White communities directed towards him. At one point it was reported that he was a household name and considered to be the most hated man in Kansas, according to local newspapers. His case attracted a tremendous amount of publicity both locally and nationally with well over 400 newspaper articles, countless televised newscasts, and several cable segments on stations such as A&E, Discovery, TLC and others, which only exacerbated the public's negative opinion towards him. The public took it personally and was angry that Grissom had always refused to talk to law enforcement germane to any aspects of his case. From the very outset of Grissom's segregation the ASRB, unit team and staff have repeatedly informed him that his initial and continued ad seg placement stemmed from (TCO) Topeka Central Office politics and that the premise is due to personal negative opinions the upper echelon of TCO's administration possessed against him and his state convictions, (exh. B3-4). While Grissom was being housed in gen pop, prior to 1996, the local newspapers reported how he received numerous visits from different women, played softball against visiting outside teams, earned extra income from leathercraft sales and was a model inmate. This infuriated the public because reporters made it sound as if he was at a country club and enjoying prison life, which was totally false. Subsequently, the local newspapers printed several articles reporting the publics discontentment with TCO and demanded that Grissom be confined in the severest environment KDOC had to offer because he needed to be "punished" for his convictions with hopes that he'd eventually concede and talk to the authorities about his case. In support of Grissom's conspiracy claim that his ad seg confinement is politically motivated and is being imposed as "punishment" for his convictions, consideration should be afforded to an article published by the Wichita Eagle newspaper on February 11, 2014 written by columnist Casey Hutchins, (exh. G12-13). The article addresses Senate Bill 330 which would automatically confine inmates with a death sentence, life without the possibility of parole and other inmates sentenced to life until they're eligible for parole in

16

administrative segregation (solitary confinement). It goes on to state that out of 1,136 that meet the criteria, 134 are currently being housed in ad seg already, which obviously includes Grissom. Senator Forrest Knox, a proponent of the bill, stated, "This has all come out of debate about capital punishment and I guess it's something I'm struggling with; that these are probably people that need to be "punished" and if you're not going to punish them with a death sentence then it raises a lot of issues," (exh. G13). Clearly the Senator as well as the other politicians that are proponents of the bill all possess the consensus that ad seg is an instrument utilized to impose "punishment" for convicted inmates with a life sentence that avoided the death penalty. Interestingly, SOC Roberts stated "Anytime you remove hope, that's going to create a new problem," yet that's exactly what he has done to Grissom by refusing to release him as long as he remained Warden at EDCF and then continuing his abuse of discretion once he was appointed Secretary of Corrections by instructing his subordinates to deny release. The politics and consensus of utilizing administrative segregation as "punishment" is defined within this article and at no time does SOC Roberts refute this position or opposes ad seg's use as punishment. The United States Supreme Court has ruled repeatedly that administrative segregation cannot be used as a pretext for punitive confinement, therefore SOC Roberts has clearly violated Grissom's liberty interests.

As previously stated, law enforcement visited Grissom twice between 1997-1999 in an endeavor to question him about his case in exchange for the procurement of his release from ad seg but he declined to cooperate both times. Consideration must be afforded to the practicality that if law enforcement possessed the ability to release him for cooperating, then it's reasonable to believe that they also possessed the ability to continue confinement in ad seg for refusing to cooperate, which can only be achieved by conspiring with Topeka Central Offices upper administration. Examples of other tactics utilized by law enforcement, (exh. G1-3). Due to the continued confinement in ad seg of Grissom, this provided the opportunity for the authorities to purposefully place known informants in a cell next to him in an endeavor to elicit information germane to his case. Grissom was cognizant of this possibility due to past futile incidents so he adopted an inexorable policy to never discuss any aspects of his case, even the minutest detail, with anyone other than his attorney, period. However, this didn't stop informants from concocting mendacities in an endeavor to procure some kind of recompense from authorities. Grissom even perused in the local newspapers how he had allegedly provided information to a prison informant that resulted in the authorities literally digging up areas throughout Kansas, which was totally false. This is an example to what extent the authorities have ventured to in an endeavor to obtain information on Grissom but this would not have been possible if TCO didn't conspire to confine him in continued segregation, which violates his liberty interests, and Civil Rights statutes.

Grissom wants to inform the Court that he isn't the only person that believes there's a conspiracy within the KDOC to treat him with malevolence. After writing to several attorneys to no avail, on June 16, 2001 he wrote a missive to his trial attorney, Thomas Erker, requesting for a list of pro bono attorneys that litigate prisoner complaints because he wanted to file a lawsuit challenging KDOC for the arbitrary unfair treatment he was being subjected to and his continued ad seg confinement. On June 21, 2001, attorney Erker responded, in Grissom's opinion, with an unethical proposal to personally repre-

17

sent him on his prisoner litigation in exchange for information germane to the location of the bodies, (exh. G4-5). He had always proclaimed his innocence to his trial attorney so he was shocked to peruse Erker's request for information that is unbeknownst to Grissom. Attorney Erker went on to state that in his "professional opinion" the treatment of malevolence that Grissom was experiencing at the hands of KDOC would continue "despite the most valiant legal efforts" until information of the location of the bodies is provided to the authorities. Grissom refused to even respond to Erker's unethical proposal and came to the realization that the conspiracy directed at him is ubiquitous within the state of Kansas, which obviously includes his trial attorney's as well.

To further support Grissom's conspiracy claim against KDOC, there were several instances of PMC members throughout the past who had written in their own words that his "high profile case" was a pre- to continue segregation despite the fact that he was in gen pop for 6 years plus prior to his ad seg placement, (exh. A7-9). His state conviction should not have any relevance to his seg placement especially since it's not even listed as a Placement Fact unless, the Placement Facts are a pretext behind the true premise for his segregation, which is what he is contending. On June 17, 2013 during his monthly ASR, UTM Marlett informed him that there were several PMC members who opposed his release due to negative personal opinions they possessed germane to his state convictions. UTM Marlett stated that a couple of PMC members had complained that Grissom had never confessed or taken responsibility for his convictions and had refused to provide information to the authorities so "she" would oppose release until such time these conditions were met. He had noticed that UTM Marlett said "she" so he inquired if that was in reference to DW Gibreal because she was the only female that he was aware of on the PMC. UTM Marlett stated, "Yes, she really doesn't like you," and UTM Marlett emphasized the word really. Grissom shouldn't be required to meet any of the conditions stipulated by DW Gibreal because they have no relevance to the legitimate penological interest of the facility. Then UTM Marlett informed him that Wilson had instructed her to peruse a book written about Grissom's case to determine if upon completion, she still felt that he "deserved" to be released. The author of said book clearly acknowledged in the preface that, despite numerous attempts, he had never interviewed Grissom nor are there any factual records of his alleged thoughts, feelings or actions, therefore the author clearly fabricated these references. For anyone, especially a PMC member who is responsible for vital decision-making, to believe that the author's depictions were veracious or base their opinions on such fabrications is absurd and irresponsible, yet that's exactly what transpired. Despite the book, the ASRB did continue to recommend him for release but the PMC predictably denied it. UTM Marlett never mentioned PMC Wilson's first name, so Grissom cannot state with absolute certainty that it was (CA) Classification Administrator Gary Wilson but based on information provided by (CO) Compliance Officer Maria Bos, he was listed as a PMC member during that time period, (exh. F12). PMC members DW Gibreal and CA Wilson arbitrarily predicated Grissom's continued segregation on personal feelings and negative opinions germane to his state convictions that possessed no relevance to the legitimate penological interest of the facility and they knowingly, willfully with malicious intent conspired to deprive him of his federally protected Due Process and Equal Protection Rights. ASRB members UTM Marlett, Lt. Randa and Clinical staff Zabel all possessed knowledge of the aforementioned facts yet they did nothing to prevent or cease their actions which violates Grissom's Civil Rights Statutes.

18

In September 2009 the EDCF Warden at the time was Raymond Roberts and he attended Grissom's ASR for that month. Grissom inquired of Warden Roberts would provide him with some kind of timeline for his possible release from seg, such as 1-5 years, 10 years, 20 etc. Warden Roberts responded with vitriol in his voice and informed Grissom that there was no timeline and that as long as he remained the Warden at EDCF, he would continue to be confined in segregation, (exh. G6). When Grissom attempted to plead in defense for release, Warden Roberts rudely interrupted him immediately and angrily stated that he didn't want to hear anything Grissom had to say and that his decision was final. Grissom then inquired if Warden Roberts would consider interstate compact and his response was "No! You'll remain right here in segregation." Staff have repeatedly informed him that he would never receive a compact because the receiving state would release him to gen pop immediately and KDOC wants him retained in ad seg. It was apparent to Grissom and LTM Hoshaw that Warden Roberts possessed an intense dislike for him that was beyond explanation except that it had to be personal. Grissom believes that the information provided to him in confidence by a past ASRB member, that Warden Roberts was from Mississippi and inherently possessed racist beliefs is veracious and is possibly the cause of his malevolence that's directed at Grissom, (exh. B4). Sometime at the end of 2010, Warden Roberts was promoted to (SOC) Secretary Of Corrections which entrusted him with absolute authority over KDOC staff and inmates. In April 2013, Grissom was approved for release by DW Snyder and DW Early, both PMC members, and just required the approval of a third PMC member, but as aforementioned, nobody would grant approval, so it was left up to Warden Heimgartner to provide the final decision. It must be noted that Warden Heimgartner was appointed to his position by SOC Roberts, much to the chagrin of several administrative and security staff who possessed the opinion that the appointment was conducted due to favoritism because Heimgartner did not meet the qualifications for said position. Grissom is cognizant of this due to several staff reference to Warden Heimgartner as "Roberts' fuck-buddy." In May 2013 UTM Marlett informed him that Warden Heimgartner was instructed by SOC Roberts to override the PMC and deny release. Grissom attempted to ascertain the specifics behind SOC Roberts opposition for release but UTM Marlett stated that she wasn't informed of what was said, (exh. G7-9). The Warden possesses the responsibility and authority to approve or deny any inmate for release from ad seg, which he has executed countless times without the intervention of SOC Roberts, and nowhere does it state in KDOC (IMPP) Internal Management Policy and Procedures, which is created by the SOC, that the Warden must obtain approval from the SOC before he can release an ad seg inmate to gen pop. This was clearly a departure from normal protocol and an abuse of discretion executed by SOC Roberts to continue imposing his will to retain Grissom in ad seg as he had vowed to do several years earlier when he was Warden. SOC Roberts and Warden Heimgartner knowingly, willfully and with insidious intent conspired to deprive Grissom of his right to be treated equally with all persons similarly situated and violates the Due Process and Equal Protection Clauses along with the Civil Rights statutes. The ASRB informed Grissom that due to SOC Roberts strong objection to his release that no PMC member was willing to oppose SOC Roberts' decision and therefore they would not support release. Warden Heimgartner, DW Gibreal, DW Nelson, DW Early, DW Snyder, CA Wilson, CA Donley, CO Call, CO Bos, UTM Marlett, Sg. Lt. Randa and Clinical staff Zabel all possessed knowledge of the aforementioned facts yet they did absolutely nothing to prevent or cease the violations against Grissom's federally protected rights and this is a display of callous indifference towards his liberty interests, the Fourteenth Amendment and the Civil Rights Statutes.

19.

Grissom contends that he possesses a liberty interest in avoiding the extremely restrictive conditions and adverse psychological effects of long-term ad seg confinement in relation to the ordinary incidents of prison life and both the duration of 19 years plus and degree of his restrictions as compared with other inmates similarly situated constitutes an atypical significant hardship. The type of inmates typically housed in long-term segregation are inmates who have been classified as administrative segregation or death row. Inmates who are being confined in disciplinary segregation for committing a rule infraction are returned to gen pop once they have served the time imposed by disciplinary procedures. Protective custody inmates are typically transferred to Ellsworth or other KDOC facilities and are not subjected to long-term segregation restrictions. The majority of KDOC inmates will never be subjected to ad seg conditions other than for brief periods of time for disciplinary sanctions, therefore, being housed in long-term ad seg is not an ordinary incident of prison life. There are approximately 9,500 inmates currently housed in KDOC and there are 384 ad seg cells at EDCF and even at full capacity it only equates to 4% of the inmate population being confined in ad seg. One must conclude that the disparity of 4% ad seg inmates compared to 96% gen pop inmates exemplifies that being confined in long-term ad seg is not in relation to the ordinary incidents of prison life and must be considered atypical and significant. EDCF has 6 ad seg cellhouses (A1, A2, B1, B2, C1, C2) and there are 64 cells in each cellhouse with A and B cellhouses being the most restrictive. The BMP is conducted in C cellhouse so inmates who are approved for release, inmates who don't cause problems and gen pop inmates under investigation or serving dis seg time are usually housed in C. A and B cellhouse has a solid concrete 3'x 8' bed with a thin 2" foam mattress inside of an 8'x 14' single-man cell. Grissom suffers from chronic pain and muscle spasms in his lower back that he and medical staff attribute to many years of sleeping on a concrete bunk. The original primary cell door that was originally installed now has an additional secondary door welded onto it so the cell doors are very solid. The sides and bottoms have thick rubber molding bolted onto them which prevents anything, including sound, from exiting the cell. There's an overhead fluorescent light that when turned off activates a smaller secondary fluorescent light so there's constant illumination. Despite the constant illumination, when officers conduct their 30-minute security checks at night, many possess these ultra-bright flashlights and they will purposefully shine it directly into the inmates eyes, which will often wake them up and makes sleeping arduous. Grissom inquired why did some officers do this and was informed that it forces an inmate to move which means he's still alive, but every 30-minutes is absurd and irritating. An ad seg inmate is locked in his cell 24-hours a day unless he chooses to attend 1-hour of out of cell exercise in a cage up to 5 times per week, but yard is occasionally cancelled due to staff shortage, inclement weather, facility lockdown and on holidays. Anytime an inmate leaves his cell he is handcuffed behind his back, escorted by officers and his cell is searched. All meals are eaten alone within his cell, (exh. G 12-15). C cellhouse conditions are identical with the exceptions that there are no rubber moldings bolted to the door and the beds are steel slabs. These extreme restrictive conditions imposed for 19 years plus has wreaked havoc on Grissom's marriage and family dynamics which resulted in him reluctantly granting his wife a divorce on March 5, 2014 and constituted an atypical significant hardship, (exh. G 10). The amenities that are afforded to gen pop inmates, even those with max custody, are significantly greater than what's being provided to ad seg inmates and many of the gen pop inmates amenities are conducive to improving relationships and family dynamics, (exh. G 11). Grissom's ex-wife has a severe spinal chord injury which requires chronic care from her mother and father who resides less than 10-minutes from her in Maryland, 1200 miles from Kansas. Prior to Grissom's divorce, he made over 7

different requests for interstate compact to move anywhere on the east coast to be closer to his only family, and even attempted to plead his case with then Warden Roberts, but was denied. As stated previously, Grissom was informed repeatedly by staff that any receiving state would release him to gen pop, because he doesn't pose a threat to their security but KDOC politics wants him confined in ad seg and the only way to ensure that confinement is to deny any compact request. Grissom received very few visits, less than 12, from his ex-wife because it was very expensive (approximately $720) to fly to Kansas, rent a car, rent a hotel room, just to visit for 1 to 2 hours on a video monitor. If Grissom was in gen pop he would've received a 7½ hour all day contact visit and simply being able to hold hands has a profound positive effect on any relationship. Not only could he have shared a freshly made meal with her but he would've been able to have photos taken to preserve a visual reference as a cherished memory. Ad seg inmates are not allowed to take photos so it's been countless years since Grissom has taken a recent photo, (exh. G11). Ad seg not only isolates the inmate in solitary confinement but it isolates him from his family and because Grissom was adopted from Seoul, Korea, his only family was his ex-wife and now that too is gone. Since he is unable to work in ad seg, he is unable to earn any money and this imposes a stressful burden upon his family, and is totally dependent on them (her) for financial support. When combined together, these stressors are extreme especially if you have to endure it for 19 years plus with no end in sight. This prolonged exposure to continued ad seg confinement has also adversely effected Grissom psychologically by altering his personality. According to Grissom's ex-wife prior to divorce, she had noticed a drastic change in him over the many years, such as; he no longer laughs, he doesn't ever sound joyful or excited, that he had become emotionally detached, nonemotive and that his once positive attitude had been replaced with bitterness. Albeit Grissom has experienced symptoms of insomnia, paranoia and no longer likes to be touched, he is in no position to evaluate himself psychologically or assess to what extent 19 years plus of continuous solitary confinement in ad seg has adversely effected him but according to numerous published reports by renowned psychologists, such duration of confinement can result in irreparable damage, Grissom can attest that it has been extremely stressful emotionally, mentally and even physically exhausting to the point of being depressed to tears and frustrated beyond description. To be hated for who others think you are, racially discriminated against, treated arbitrarily and unfairly, incessantly for 19 years plus by individuals with such arrogance, malevolence and the knowledge that they can do as they please to you and there's nothing you yourself can do about it truly sucks and is demoralizing. Grissom claims the duration of 19 plus years in long-term ad seg under the extreme restrictive conditions and to the degree they were imposed compared with other inmates similarly situated, wreaked havoc on his marriage, caused adverse psychological damage, emotional and mental stress, with no reprieve available or in sight in relation to the ordinary incidents of prison life constitutes an atypical significant hardship and violates his liberty interests, under the 8th Amendment and 14th Amendment.

Grissom would like to inform the Court that ever since the initial filing of his grievance on April 30, 2015 that some EDCF staff have purposefully twarted his ability to obtain pertinent documents required to substantiate his claims therefore causing a delay in the filing of this complaint. The facility mailroom between June 19, 2015 to July 13, 2015 seized over 6 separate envelopes that contained vital information and signed Declarations of facts that "mysteriously" disappeared when Grissom requested for it to be returned to the sender. Then between May 2015 to July 2015 every Form-9 submitted to ccII Moore request-

ing copies of past ASR reports, PMC reports and other related paperwork was handed back to Grissom with CCII Moore verbally stating that nothing could be located. On June 3, 2015 Grissom requested for CCII Moore to explain in writing why he couldn't locate said paperwork and he stated, "Due to system failures and time these files are unable to be found," (exh. F16 ). This was a blatant lie and so were all the other denials. The reason why it's a lie is because when CCII Moore didn't work for a week in the beginning of June 2015, CCI Billie Grey filled in for him so Grissom figured that it wouldn't hurt to resubmit an identical Form-9 request to her and she located every single document listed. Now that Grissom knew for certain that other documents indeed existed, he submitted another Form-9 to obtain the final remaining ASR from 2013 to 2014 but once again CCII Moore informed Grissom that he couldn't locate anything. At the end of June, beginning of July 2015 CCII Moore was gone for another week so Grissom resubmitted his Form-9 to CCI Grey and she informed him that she would look for it when she had time. When he didn't receive a response for 2 weeks he inquired if she had forgotten his Form-9. Apparently, CCII Moore upon returning to work had informed CCI Grey that he had already searched for said paperwork to no avail. Grissom then explained to CCI Grey that he believed CCII Moore was purposefully refusing to provide him with the ASR reports because he knew Grissom needed them for his lawsuit, so she instructed him to resubmit another Form-9 addressed to her and albeit she worked in the adjacent C2 cellhouse she would attempt to obtain the ASR reports requested. Unfortunately CCI Grey was gone for a week and she kept informing him to be patient because she was busy with the C2 side. It was imperative for Grissom to obtain the ASR reports because it was definitive proof supporting his claims, so for the fourth time he pleaded with CCI Grey and explained to her that it was the only thing preventing him from completing his complaint. Another week passed but finally almost 2 months after the initial Form-9, on August 20, 2015 CCI Grey located the remaining ASR reports in Exhibit C he had requested which proved that CCII Moore had obviously lied to his co-worker as well as Grissom. In July 2015 Grissom attempted to have CCII Moore xerox several copies of the handwritten information of the name, race and DR history of every ad seg inmate that he had acquired over the telephone, (exh. E18-26). But CCII Moore came to his cell and demanded to know how and where was he obtaining all of this information. Initially he refused to inform CCII Moore of anything because he didn't see how it was any of his concern but CCII Moore responded by stating that the copier was broken and so he would attempt to return his paperwork the following day. After CCII Moore walked away, Grissom realized that something was amiss and he couldn't afford for his paperwork to be seized or "mysteriously" disappear so he called CCII Moore back to his cell and informed him how the information was retrieved off of the prison's public website, Kasper, by the religious couple that was assisting him, and read it over the phone. Less than 10 minutes later CCII Moore returned with the xerox copies, so apparently the copy machine was not broken. It must be noted that as of date, August 20, 2015, rumor has it that CCII Moore has been promoted to Unit Team Manager and UTM Walmsley is applying for the Compliance Officer position on the PMC. This means that UTM Moore will soon head the ASRB despite his racist comments and actions and blatant lies. Obviously, Grissom's grievance has absolutely no bearing or relevance and probably propelled UTM Moore to his position. EDCF staff, the mailroom, CCII Moore and CCI Grey knowingly, willfully and intentionally have obstructed Grissom's ability to access the courts by refusing to provide copies of vital paperwork in a timely manner and seizing papers that possess evidence against KDOC in an endeavor to frustrate and impede his rights protected under the First Amendment of the US. Constitution.

Grissom is cognizant that he is required to submit additional copies of his complaint and exhibits to the court but does not feel that it's prudent to have the unit team staff that he's suing zerox the copies due to the difficulty they have already caused in thwarting his ability to obtain KDOC documents and he does not want any of his exhibits seized like previously or to "mysteriously" disappear. He also believes that there may be immediate retaliation to some degree once they peruse the specifics with corroborating exhibits. Therefore, Grissom is mailing out the complaint and exhibits to the religious couple that's been assisting him to make 4 complete copies and 18 complaint copies and forward them to the court along with the original complaint. I realize that this increases the delay slightly but prison officials in the past have clearly operated under pretext and spurious justifications without any consequences so Grissom wants the court to possess the complaint first, then any subsequent pernicious actions imposed by prison officials will be judged accordingly to determine if it's in relation to this complaint, or retalitory.

I, Richard Grissom, have read the following statement and hereby verify that the facts stated herein are true to my knowledge and the facts stated on information and belief are true to the best of my knowledge and belief. Pursuant to 28 U.S.C. 1746, I verify under penalty of perjury that the foregoing is true and correct.

_Richard Grissom_
Richard Grissom

Subscribed and Sworn to before me on this 1st day of October, 2015.

_Allison Austin_
Notary Public

NOTARY PUBLIC - State of Kansas
ALLISON AUSTIN
My Appt. Expires 9-19-18

## C. CAUSE OF ACTION

1) I allege that the following of my constitutional rights, privileges or immunities have been violated and that the following facts form the basis for my allegations: (If necessary you may attach up to two additional pages (8h" x 11") to explain any allegation or to list additional supporting facts.)

A) (1) Count I: *Defendants knowingly, willfully with malicious intent executed arbitrary decision-making and treatment, abuse of discretion and exhibited callous indifference violating Grissoms Due Process and Equal Protection Clauses and Liberty interests of 14th Amend.*

(2) Supporting Facts: (Include all facts you consider important, including names of persons involved, places and dates. Describe exactly how each defendant is involved. State the facts clearly in your own words without citing legal authority or argument.):

*Defendants on pages 8-11 refused to recommend Grissom for release, there's no written criteria to progress towards release, the ASR's are hasty perfunctory and meaningless, they cite rote reiterations of stale, justifications with no legitimate penological interest, segregation is indefinite, duration is atypical and the degree of restrictions when compared to other ad seg inmates similarily situated is egregiously disparate and arbitrarily executed.*

B) (1) Count II: *Defendants knowingly, willfully with malicious intent exhibited racial bigotry, racists views, racial segregation, racial discrimination and preferential treatment of White staff and inmates violating Grissom's 14th Amendment and Civil Rights Statutes.*

(2) Supporting Facts: *Defendants on pages 11-16, statistical data vividly shows racial disparity in the duration confined in ad seg, DR criteria to recommend release, decision-making process to approve for release, racial comments directed at Blacks, cell segregation assignments, racial disparity of White KDOC staff to minority seg inmates,*

C) (1) Count III: *Defendants conspired with each other to continue undefinite, confinement in ad seg under pretext as "punishment" for his state convictions and knowingly, willfully with deliberate indifference deprived Grissom of his 14th Amendment Rights and Civil Rights Statutes.*

(2) Supporting Facts: *Defendants on pages 16-19 conspired with each other to utilize ad seg as punishment under pretext, endeavored to elicit information germane to state convictions in exchange for release, abuse of discretion to indefinitely confine Grissom in ad seg with no true possibility of release.* (continued on page 26)

## D. PREVIOUS LAWSUITS AND ADMINISTRATIVE RELIEF

1) Have you begun other lawsuits in state or federal court dealing with the same facts involved in this action or otherwise relating to the conditions of your imprisonment? Yes ☑ No ☐ . If your answer if "Yes", describe each lawsuit. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper, using the same outline.)

   a) Parties to previous lawsuit:

   Plaintiffs: *Richard Grissom*

   Defendants: *Roger Werholtz, et al*

   b) Name of court and docket number *U.S. District Court For the District Of Kansas    / Don't know docket number*

   c) Disposition (for example: Was the case dismissed? Was it appealed? Is it still pending?) *Failure to indicate if suing in personal or official capacities, qualified community, case was dismissed.*

   d) Issues raised *Depriving Property, Denying Magazine Subscriptions, Transfer and Loss of Documents, 24-hour Surveillance, 902 Isolation Days, Excessive Searches, Force To Change Religious Denomination*

CIVIL RIGHTS COMPLAINT §1983

## Cause Of Action Continued

Count IV : The prolonged adverse effects and excessive duration of 19 years plus of continuous in-definite solitary confinement can cause irreparable substantial psychological, emotional, mental and emo-tional damage which constitutes Cruel and Unusual Punishment and violates the 8th Amendment and the Equal Protection of the 14th Amendment.

Supporting Facts : Defendants on pages 20-21 have subjected Grissom to the harsh restrictive conditions of continuous long-term solitary confinement excessively longer than any other Kansas inmate, the in-determinacy of duration with no hope for reprieve, abuse of power utilized to demoralize, inability to pro-vide any financial support to himself or family, the incessant numerous stressors, the havoc that destroy-ed his marriage, sleepless nights, paranoia and no physical contact or visits and personality changes.

Count V : KDOC repeatedly attempted to impede and frustrate Grissom's ability to file his complaint in a timely manner and seized numerous papers and Declarations vital to his claims which violates his ability to access the Courts and the First Amendment.

Supporting Facts : Defendants on pages 21-22 seized 6 plus envelopes of publically accessible infor-mation off of the prison website and Declarations of facts, refused to locate KDOC information, took al-most 2 months to xerox ASR copies, Declarations "mysteriously" lost in the mail, staff informing other staff that ASR reports don't exist due to computer data being lost.

## Administrative Relief Continued

Grissom used the prisoner grievance procedure available at El Dorado Correctional Facility to at-tempt and solve the problem. On April 30, 2015 Grissom presented the facts stated herein this com-plaint, (exh. H1-6). On May 1, 2015 Grissom was sent a response from UTM Walmsley stating that the grievance was denied, (exh. H7). On May 12, 2015 Grissom was sent a response from Warden Heim-gardner stating that his grievance was denied, (exh. H8). On May 13, 2015 Grissom appealed the denial of his grievance to SOC Roberts, (exh. H12) and mailed said appeal to KDOC in Topeka Central Office, (exh. H9). On June 10, 2015 Grissom had not received a response from SOC Roberts within the 20-day time limit mandated by KAR 44-15-102. so he sent a Form-9 to CCI Moore inquiring about the status of his grievance with no resolution so he resubmitted another Form-9 on June 11, 2015 to no avail, (exh. H10-11). Then on June 15, 2015 Grissom sent a Form-9 to CCI Grey and she was able to track it down to Tope-Ka Central Office where it had been ignored for over a month. On June 18, 2015 Grissom finally received a response on his appeal, stating that it was "invalid," (exh. H13). Albeit Grissom had addressed several separate issues within his grievance, KDOC refused to acknowledge or have the courtesy to respond to them and denied his grievance in its totality.

e) Approximate date of filing lawsuit _December 2007_

f) Approximate date of disposition _August 2012_

1) I have previously sought informal or formal relief from the appropriate administrative officials regarding the acts complained of in Part C Yes ☑ No ☐. If your answer is "Yes", briefly describe how relief was sought and the results. If you answer is "No", briefly explain why administrative relief was not sought.

(continued on page 26)

2)   REQUEST FOR RELIEF

1) I believe that I am entitled to the following relief:

_A preliminary and permanent injunction ordering Defendants to cease and desist from all violations stated herein, and admit said violations. To remove all descrepencies from Plaintiff's prison records, Immediate release to gen pop and interstate compact to an approved state of Plaintiffs choosing. Compensatory damages in the amount of $150,000.00; and Punitive damages of $350,000.00 against each defendant, jointly and severally._

_____          _____
Signature of Attorney (if any)                            Signature of Petitioner

_____

_____

_____
(Attorney's full address and telephone number)

XE-2 8/82                          CIVIL RIGHTS COMPLAINT §1983

27.

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares (or certifies, verifies, or states) under penalty of perjury that he is the plaintiff in the above action, that he has read the above complaint and that the information contained therein is true and correct. 28 U.S.C. § 1746.  18 U.S.C. § 1621.

Executed at _EDCF, El Dorado, Kansas_   on   _October 1_____, 20_15_.
        *(Location)*                              *(Date)*

_____
                    *(Signature)*

28.