IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

RICHARD GRISSOM,

Plaintiff,

vs.                                Case No. 15-3221-JTM

RAYMOND ROBERTS, *et al.*,

Defendants.

MEMORANDUM AND ORDER

Plaintiff Richard Grissom is an inmate currently incarcerated at the El Dorado Correctional Facility (EDCF) in El Dorado, Kansas. He was housed in administrative segregation during the relevant time periods of this lawsuit. He is currently serving four consecutive life sentences and is not eligible for parole until 2093.

Grissom instituted the present litigation seeking monetary damages and injunctive relief for his recent placement in segregation at EDCF. In addition to his original Complaint, the plaintiff has also filed an Amended Complaint in which he expanded on his original allegations. He later obtained leave to file a Supplemental Complaint, which ultimately appears to address separate claims against separate defendants.

Grissom's Amended Complaint essentially advances three general claims — that he

was denied his due process right to liberty by the segregation, that the defendants discriminated against him in placing or keeping him in segregation, and that the defendants engaged in an illegal conspiracy to coerce him into revealing the location of the bodies of his victims.

Grissom's Supplemental Complaint has little in common with the Amended Complaint. The Supplemental Complaint focuses on Grissom's alleged treatment while in segregation, with the plaintiff contending that the Supplemental defendants imposed disciplinary measures in a retaliatory fashion and in violation of his Eight Amendment rights. Only one of the defendants named in the Amended Complaint (Maria Bos) is also named in the Supplemental Complaint, and vice versa. Grissom has also moved for injunctive relief, seeking an order precluding future segregation.

As the defendants have been served with process, the defendants have moved for summary judgment as to Grissom's claims (Dkt. 35, 45, 75), asserting that they are protected by qualified or Eleventh Amendment immunity, that they did not personally participate in any given deprivation, and that no evidence of the claimed conspiracy exists. They also argue that plaintiff's request for injunctive relief is moot. The court finds that the defendants' motions should be granted.


**Uncontroverted Facts**

Summary judgment is proper where the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no

2

genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c).  In considering a motion for summary judgment, the court must examine all evidence in a light most favorable to the opposing party. *McKenzie v. Mercy Hospital*, 854 F.2d 365, 367 (10th Cir. 1988).  The party moving for summary judgment must demonstrate its entitlement to summary judgment beyond a reasonable doubt. *Ellis v. El Paso Natural Gas Co.*, 754 F.2d 884, 885 (10th Cir. 1985).  The moving party need not disprove plaintiff's claim; it need only establish that the factual allegations have no legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir. 1987).

In resisting a motion for summary judgment, the opposing party may not rely upon mere allegations or denials contained in its pleadings or briefs.  Rather, the nonmoving party must come forward with specific facts showing the presence of a genuine issue of material fact for trial and significant probative evidence supporting the allegation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).  Once the moving party has carried its burden under Rule 56(c), the party opposing summary judgment must do more than simply show there is some metaphysical doubt as to the material facts.  "In the language of the Rule, the nonmoving party must come forward with 'specific facts showing that there is a **genuine issue for trial**.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis in *Matsushita*).  One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses, and the rule should be interpreted in a way that allows

it to accomplish this purpose. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

The court excludes from the present findings any requested fact, or putative denial of facts otherwise established by the evidence, which are not grounded on admissible evidence or which are not supported by any concise citation to the evidentiary record. *See* D.Kan.R. 56.1. 56.1(b)(2); *Sperry v. Werholtz*, No. 04-3125-CM, 2008 WL 4216110, at *1 (D. Kan. Sept. 12, 2008) (*Grissom I*), *aff'd*, 321 F. App'x 775 (10th Cir. 2009) (Rule 56.1(d) requires denials based on personal knowledge of the affiant). Thus, the common rejoinder by the plaintiff to numerous facts established by the defendants, namely, that he does not personally believe the evidence offered by the defendants, is insufficient create a factual dispute.

The defendants named in plaintiff's Amended Complaint include James Heimgartner (EDCF Warden from 2011 to the present), Ray Roberts (Warden of EDCF from 2003 to 2011, and the Secretary of Corrections for the Kansas Department of Corrections from 2011 to 2015), Johnnie Goddard (Deputy Secretary of Facilities Management and former Interim Secretary of Corrections), Fred Early (Deputy Warden at EDCF in charge of programs and operations), Mary Wilson (who holds a similar position), Dale Call (a Compliance Officer assisting the Warden and Deputy Warden on compliance issues), Deane Donley (originally a Reception Diagnostic Unit officer, later a Classification Administrator overseeing the Unit and Deputy Warden), Maria Bos (a unit team manager in a general population cell house, later a Compliance Officer, and eventually a Classification Administrator in charge of the classification staff), Paul Snyder (Deputy

4

Warden), Brandon Walmsey (Corrections Manager II at the Reception Diagnostic Unit),
Timothy Randa (a Lieutenant, and later Captain, in charge of segregation security officers),
Roland Buchanan (another Lieutenant in segregation), and Matthew Moore (Corrections
Counselor II).

The Supplemental Complaint names as defendants Tammy Martin (Unit Team
Manager at EDCF), Allison Austin (also a Unit Team Manager), Billie Grey (an employee
of EDCF), Charles Miller (another employee), Susan Gibreal, as well as Maria Bos. Other
than Bos, none of the original defendants in Amended Complaint are implicated in the
Supplemental Complaint.

As indicated earlier, the Amended Complaint generally focuses on the placement,
and ultimate removal, of Grissom in segregation. In contrast, the Supplemental Complaint
presents various grievances regarding Grissom's experiences while in segregation, and is
largely unconnected to the facts asserted in the earlier complaint.

The prison's Administrative Segregation Review Board (ASRB) conducts monthly
hearings to determine whether to recommend the release of an inmate from administrative
segregation to general population. The ASRB is comprised of a Unit Team Manager, head
security officer of the specific cell house, and a member of the Mental Health Staff. Randa
and Buchanan are (or were) members of the ASRB.

These reviews require ASRB members to consider a questionnaire filled out by the
inmate on the day prior to the hearing. The panel then holds a hearing, with or without the
participation of the inmate. A request for participation is solicited from each inmate. After

5

the review, the staff comments are summarized and printed in a report. Not every comment made at a hearing is incorporated into these reports.

Recommendations by the ASRB are then reviewed by the prison's Program Management Committee (PMC). The ASRB comprises the Warden (or designee), and administrative representatives from the Programs and Security divisions of the facility. The PMC formulates its own recommendation to the Warden. Heimgartner, Early, Call, Wilson, Donley, and Bos are PMC members.

Other than Heimgartner, none of the defendants has the autonomous authority to release any inmate from administrative segregation. Only the Warden has the final authority to grant or deny a release.

In the past, Grissom has been able to procure a cell phone and other contraband while housed in administrative segregation. He did so by influencing and compromising staff and other inmates who supplied him with contraband.

Security cameras were installed in Grissom's cell to monitor his interactions with prison staff.

In October 2015, Grissom again attempted to commence an improper relationship with prison security staff, passing a note to COI Jaymee Cook which contained sexually suggestive content which indicated his intent to engage in an impermissible sexual relationship. Grissom was issued, and convicted of, a disciplinary report in violation of K.A.R. 44-12-328 (Undue familiarity).

From August 20, 2014 through August 17, 2015 Grissom was offered monthly

reviews of his administrative segregation. The ASRB never recommended his release from segregation.

Grissom claims that Defendant Moore informed another inmate that he would not be released from administrative segregation because he was black. However, Moore denies making any such comment, and in any event Moore is unable to release an inmate from administrative segregation.

From August 2013 through the present, State Defendants are unaware of any outside law enforcement officials who have attempted to solicit information from Grissom regarding any investigation outside of the Department of Corrections facilities.

Grissom alleges that Austin placed a disciplinary segregation sign above his door, would not allow him to make a telephone call while he was serving a segregation term, destroyed his legal papers; refused to advance him to level II incentive status, and failed to submit a canteen bubble sheet, and (together with Martin) required him to wear boxers for two hours a day before going out to the yard. He alleges that Martin confiscated his personal property and would not return it until after his disciplinary report hearing. He alleges that Grey forged her supervisor's signature on a grievance, and that Bos and Miller gave the wrong reasons that his property was held in storage. He also alleges that various items were missing from his legal file. During 2015, Grissom advanced numerous grievances against the Supplemental Complaint defendants — on April 30 (Raymond Roberts, et al); September 14 (Grey and Austin); September 18 (Grey); October 20 (Martin); November 4 (Martin); and December 20 (Austin).

On October 8, 2015, Grissom was moved from C cellhouse to B cellhouse after receiving a charge for a disciplinary report, based on a sexually explicit note he passed to an officer while he was in the Behavior Modification Program while in segregation in C cellhouse. The only cell available in B cellhouse when Grissom was moved there was an observation cell, which includes no hard property except for a mattress that is on the floor.

Grissom stayed in the observation cell for five days. On October 13, he was moved to a regular cell once one opened up in B cellhouse.

Martin was informed when Grissom was moved to B cellhouse that his property was in storage so that Enforcement, Investigations, and Apprehensions (EAI) or Special Security Team (SST) could search it for any letters indicating further undue familiarity, which was the basis for his pending disciplinary charge, or contraband. SST did, in fact, search his property on October 25, 2015, after Grissom received his property back from storage.

In addition, because only an observation cell was available in any of the segregation living units, he was temporarily without his property while in the observation cell. This is because inmates are not permitted to possess any hard property in an observation cell.

It was Martin's understanding that Grissom's property was also held in storage because it was not in compliance with property limitations for an inmate who was on incentive level D for disciplinary segregation.

After looking at his records, Martin determined Grissom was not placed on incentive level D until October 22, 2016, the day after he received all of his incentive level III property back from storage. At that point, he should not have been able to possess all

8

of the property he previously possessed. However, it appears a mistake was made, and he was allowed to keep all of the incentive level III property that is permitted in a segregation unit.

After Grissom was convicted of his disciplinary charge, he was moved from incentive level III to incentive level I, under which an inmate is permitted less property.

Again however, Grissom was allowed to keep all of the property he possessed previous to being placed on incentive level D or on incentive level I. Thus, he actually benefitted from this mistake.

Bos sent a letter to Grissom on November 12, 2015 explaining why his property had been held.  She wrote that the property was not in compliance with level I property limitations and that it was being held for this reason.

Martin never touched Grissom's property and is not aware of any property that was confiscated from him. Grissom was given all of his property back on October 21, 2015.

Grissom was required to serve 30 days of disciplinary segregation after he was convicted of his disciplinary report for undue familiarity. He was given credit for the five days he spent in the observation cell, and two days that he was without his property. Thus, he only spent 23 days on disciplinary segregation status.

Martin denies that Grissom was required to sit in his cell in only boxer shorts for two hours a day in order to be permitted to go to the yard. Cell house rules provide that, in order to go to the yard, inmates must be up and ready to go when an officer reaches his cell door to take the inmate to the strip-out cell before yard time. If the inmate is not up and

ready by the time the officer reaches his cell door, the inmate is not permitted to go to the yard.

The reason for this policy is to streamline the process for strip searching segregation inmates in order to search for contraband before they go to yard. If inmates are wearing socks, hoodies, or clothes other than boxers and a shirt each time an officer reaches a cell, it takes considerably more time for each inmate to take off those clothes and get out of the cell in preparation for the strip search that is required before yard time.

Officers start on one side of the cell block and announce which side they are starting with, so the inmates on the other side know that they do not have to immediately be up and ready. Usually officers announce when they are getting close to each cell so that the inmate in the cell knows that it is time for him to prepare to be up and ready.

Martin knows of only a single occasion in which Grissom was not up and ready and he was not permitted to go to yard.

Grissom is not required to sit in only boxer shorts while waiting to go to yard. Rather, he is only required to prepare to be up and ready right before an officer gets to his cell.

Grissom claims that, on January 6, 2016, he submitted a form 9 to Defendant Austin requesting to be advanced to incentive level II the following month.

However, Austin has no authority to advance any inmate to a higher incentive level before the inmate becomes eligible to do so. According to EDCF Internal Management Policy and Procedure (IMPP) 11-101, Austin does not have authority to advance inmates

10

to a different level before they become eligible to be placed on a different incentive level.
IMPP 11-101 states the following.

> Any inmate who, after his or her most recent admission, sustains a second
> or subsequent return to Level I (i.e., the inmates' third or greater time on
> Level I), must remain free of convictions related to class I and class II
> disciplinary reports, and demonstrate a willingness to participate in
> recommended programs and/or work assignments for two hundred forty
> (240) days from the date of his or her last return to Level I.

All inmates are subject to this policy and are treated that same, and Austin has never advanced an inmate to a higher incentive level before the inmate was eligible

Grissom was placed on incentive level I on November 13, 2015, the third time he had been placed on this level. He had been previously dropped to incentive level I twice in 2005 and once in 2004. Accordingly, Grissom was not eligible for advancement to another incentive level for 240 days.

As of January 6, 2016, 240 days had not yet passed since the date he was placed on incentive level I. Thus, Grissom had not yet become eligible to advance to another incentive level.

Austin does not place disciplinary signs above inmates' doors and did not place a sign above Grissom's door. Other officers may place signs above any inmate's door who is in disciplinary segregation. This is the same for all inmates who are in disciplinary segregation.

The purpose of the signs is to let other officers know that the inmate is in disciplinary segregation, so that they know how much property the inmate is allowed to

have, along with other restrictions that are placed on inmates in disciplinary segregation.

Grissom's claim that he was not allowed to have any telephone calls for 30 days while in disciplinary segregation is true. However, under cellhouse rules for A, B, and C cellhouses, no disciplinary segregation inmates get telephone calls. This is the same for all inmates who are in disciplinary segregation.

Grissom claims that he lost legal papers that were attached to an account withdrawal request on October 28, 2015, and believes that Austin destroyed them. Austin denies doing this. When she receives an account withdrawal request, Austin places the request in the accounting box to be processed that same day. If legal papers were attached to one of Grissom's account withdrawal requests, she would have submitted the request to be processed with the legal papers attached.

Grissom was released from segregation into general population while on step three of the Behavior Modification Program on December 5, 2016.

Although Grissom did receive a disciplinary report for undue familiarity on October 5, 2015, he remains in general population. Absent additional infractions, EDCF officials have no plan to place Grissom back into segregation.


**Conclusions of Law**

When a defendant pleads qualified immunity, the plaintiff must show both that the defendant's actions violated a federal constitutional or statutory right, and that the right was clearly established at the time. *Scott v. Hern*, 216 F.3d 897, 910 (10th Cir. 2000)

12

(quotations omitted). When advanced at the summary judgment stage, "the burden shifts to the plaintiff to show that: (1) the defendant violated a constitutional right and (2) the constitutional right was clearly established." *Thomson v. Salt Lake Cnty.*, 584 F.3d 1304, 1312 (10th Cir.2009) (internal quotation marks omitted). In resolving the issue, the court construes the facts in the light most favorable to the plaintiff. *Id.*[1]

Here, to establish his due process claim, the plaintiff must demonstrate that the defendants deprived him of a constitutionally protected liberty interest. *Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006). Conditions of confinement do not invoke a liberty interest unless they "impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandlin v. Conner*, 515 U.S. 472, 484 (1995). The court finds that the plaintiff has failed to demonstrate that he had a liberty interest in an early release from segregation.

"Prisoners held in lawful confinement have their liberty interests curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." *Wilkinson*

---

[1] Citing *Harbert Int'l, Inc. v. James*, 157 F.3d 1271 (11th Cir. 1998), Grissom argues that before they can invoke the protection of qualified immunity, the defendants must first show they were acting in the scope of their discretionary authority. *See Harbert*, 157 F.3d at 1281 (qualified immunity is not available for an official who "goes completely outside the scope of his discretionary authority" and "is acting wholly outside the scope of his discretionary authority"). The defendants argue that this Eleventh Circuit standard has never been explicitly adopted in the Tenth Circuit, *see PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1196 (10th Cir. 2010); *Scott v. Hern*, 216 F.3d 897, 910 (10th Cir. 2000), but it unnecessary to resolve the issue, as the pleadings demonstrate that plaintiff is indeed arguing that defendants (the Warden, the Secretary of Corrections, members of the ASRB and PMC, and prison staff) failed to approve his early release from segregation, a decision within their discretionary authority.

*v. Austin*, 545 U.S. 209, 225 (2005). In determining whether a liberty interest exists, the court

considers whether (1) the segregation supports a legitimate penological interest, such as

safety or rehabilitation, (2) the conditions of confinement are extreme, (3) the segregation

increases the duration of the confinement, and (4) any indeterminancy in the segregation.

*See Estate of DiMarco v. Wyoming Dept. of Corr.*, 473 F.3d 1334, 1342 (10th Cir. 2007).

The Tenth Circuit has previously addressed Grissom's liberty interests in previous

litigation challenging his placement in segregation. *See Grissom v. Werholtz*, No. 07-3302-

SAC, 2012 WL 3732895 (D. Kan. Aug. 28, 2012), *aff'd*, 524 Fed.Appx. 467 (10th Cir. 2013).

The Tenth Circuit affirmed the district court's determination that Grissom's segregation did

not implicate a liberty interest. Applying the relevant factors, the court observed:

> With respect to the first factor, the court found that defendants had met their
> burden of showing a reasonable relationship between Mr. Grissom's isolation
> and the prisons officials' asserted penological interests, noting Mr. Grissom's
> propensity for obtaining dangerous contraband and the security risks created
> by such behavior. On the second factor, the court concluded that the
> conditions Mr. Grissom endured in segregation were not extreme or atypical.
> On the third factor, the court noted that Mr. Grissom is serving four life
> sentences and his parole-eligible date has not been affected by his placement
> in segregation. Finally, on the fourth factor, the court found that Mr.
> Grissom's placement in administrative segregation is not indeterminate
> because the prisons conducted regular reevaluations of Mr. Grissom's
> placement in administrative segregation via twice-yearly program reviews,
> as well as various monthly reviews.

524 Fed.Appx. at 474-75.

These conclusions are appropriate here. The prison had a legitimate penological

interest is segregating the plaintiff. Evidence in the record supports the conclusion that

Grissom has been able to obtain contraband items while in segregation by bribing or

corrupting guards. And there is evidence that in violation of prison rules Grissom attempted to encourage an inappropriate relationship by passing a sexually explicit note to a female corrections officer. Grissom has failed to provide any admissible evidence that the reviewing authorities, including the ASRB and the PMC, acted in a discriminatory fashion or with improper intent. Accordingly, the first factor supports a determination in favor of the defendants.

Second, the segregation experienced by Grissom is similar to that addressed in *Grissom I* — it is, though harsh, neither extreme or atypical in comparison to other prisoners in segregation. *Cf. Sandin v. Conner*, 515 U.S. 472, 483 (1995) ("federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile [prison] environment"). Prison inmate segregation as practiced in Kansas has been upheld by the courts as not atypical or harsh. *See Counce v. Wolding*, 2016 WL 2344560, *7 (D. Kan. May 4, 2016) (segregation is "within the discretion of prison officials, and generally not reviewable in federal court," and inmate failed to show "such extreme conditions or restrictions, and adverse impacts to show they were atypical and significant deprivations warranting due process protections").

Third, the period in segregation did not change the total imprisonment time faced by the plaintiff, who is serving four consecutive life terms and will not be eligible for parole until 2093.

Finally, the segregation was not "indeterminate" in that the plaintiff's status was subject to periodic monthly reviews. Although Grissom complains these reviews were

perfunctory, the evidence establishes otherwise. The reviews were detailed, meaningful, and substantive, even if the plaintiff disliked the results. Each month, ASRB members conduct hearings on inmates held in segregation, and consider questionnaires completed by the inmates. Inmates are asked to participate in the hearing, and a hearing is conducted with or without such participation. The committee issues a summary report based on member comments, although not every comment is incorporated into the report. If an inmate has been in segregation for more than six months, the PMC considers whether to transfer the inmate to an alternative program. The proceedings are similar to those in place in *Grissom I*, and the plaintiff has failed to cite evidence that procedures were defective in any substantial way.

The uncontroverted facts show that the prison provided for periodic, reasoned examination of the segregation, that the plaintiff had notice and the chance to respond to these reviews, and that defendants acted with consideration for legitimate safety and security concerns. Here, due process is satisfied if Grissom received: (1) a sufficient initial level of process, i.e., a reasoned examination of the assignment; (2) the opportunity to receive notice of and respond to the decision; and (3) safety and security concerns are weighed as part of the placement decision. *DiMarco*, 473 F.3d at 1344 (citation omitted)

Accordingly, the defendants have met the first prong of qualified immunity—the defendants did not violate any liberty interest of the plaintiff. Moreover, defendants are also entitled to summary judgment under the second prong, because Grissom has failed to demonstrate that the alleged liberty interest was clearly established. To the contrary, the

16

plaintiff's response fails to make any argument in support of finding that plaintiff had a clearly established liberty interest in early release from segregation or in the application of any particular alternative review procedures.

Next, defendants seek summary judgment as to any claims against them in their official capacities pursuant to the Eleventh Amendment. "It is well-settled that a request for money damages against a state defendant in his official capacity is generally barred by the Eleventh Amendment." *Hunter v. Young*, 238 Fed. Appx. 336, 338 (10th Cir. 2007). *See, e.g., Elephant Butte Irr. Dist. of New Mexico v. Dep't of Interior*, 160 F.3d 602, 607 (10th Cir. 1998) ("[t]he Eleventh Amendment generally bars suits against a state in federal court commenced by citizens of that state or citizens of another state). "An official-capacity suit is, in all respects other than name, to be treated as a suit against the entity . . . it is not a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985). As employees of the State and the Kansas Department of Corrections during the time in question, State Defendants share the State's immunity for suits against them in their official capacities. *Jones v. Courtney*, 466 F. App'x 696, 698 (10th Cir. 2012). Because they share the State's immunity from suit, Grissom's official capacity claims should be dismissed pursuant to Fed. R. Civ. P. 12(b)(1).

Of course, the Eleventh Amendment does not bar actions for injunctive relief. See *Ex Parte Young*, 209 U.S. 123, 159–60 (1908). However, the entire thrust of the plaintiff's complaint has been directed at the past actions or inactions of individual prison officials, rather than a challenge to particular prison policies. And, as noted elsewhere in the Order,

the plaintiff's claim seeking release from segregation is rendered moot by his release from segregation. The plaintiff's response fails to address the issue of Eleventh Amendment immunity, and the court grants summary judgment as to the claims against defendants in their official capacities.

As noted earlier, the plaintiff also argues that the defendants discriminated against him by placing him in segregation. The Equal Protection Clause requires "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). The plaintiff in the present action has failed to show that he was treated differently from similarly situated prisoners. Where a prisoner challenges institutional treatment, he must show first that he was treated differently from similarly situated general population inmates, and second that this difference was grounded on something other than legitimate penological interests. *Fogle v. Pierson*, 435 F.3d 1252, 1261 (10th Cir. 2006) (citations omitted).

Because of the need to balance inmate rights with prison administrate needs, the Supreme Court has held that a prison regulation "is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Citing *Turner*, the Tenth Circuit has identified four relevant factors:

> (1) whether a valid and rational connection exists between the regulation and a legitimate governmental interest advanced as a justification; (2) whether, notwithstanding the regulation, alternative means exist for the prisoner to exercise the right; (3) what effect an accommodation of the prisoner's constitutional right would have on guards, inmates and prison resources; and (4) whether an alternative is available which would accommodate the prisoner's rights at a *de minimis* cost to valid penological interests.

18

*Patel v. Wooten*, 15 Fed.Appx. 647, 650-51 (10th Cir. 2001).

Here, the plaintiff has failed at both steps. First, he has failed to demonstrate he was treated differently from similarly situated inmates. The plaintiff has failed to provide any specific information which would permit the court to find that inmates who received supposedly more favorable treatment were in fact similarly situated. In contrast, as noted earlier, defendants have provided evidence that the plaintiff is very much unlike other inmates, having corrupted staff members into passing him contraband cell phones into his segregation cell on three occasions, and recently attempting to continue such activities by passing a sexually explicit note to a female staff officer.

The same evidence demonstrates that the prison had a legitimate penological interest in segregating Grissom as a means to ensure prison safety. The segregation was reasonably related to plaintiff's continuing efforts to undermine prison regulations and effective order. The plaintiff has failed to show alternative treatment would be similarly effective, and there is no evidence that any defendant with decision-making authority as to plaintiff's segregation status acted with any improper motive.[2]

---

[2] Defendants Roberts (Warden of the El Dorado prison until 2011 and Secretary of Kansas Department of Corrections from 2011 to 2015) and Goddard (former Interim Secretary of Corrections and now Deputy Secretary of Facilities Management) have also moved for dismissal on claims against them because they had nothing to do with deciding to put or keep Grissom in segregation. The court finds that summary judgment is warranted. To the extent that the allegations against Roberts touch on his service as Warden, that service ended in 2011. Any claims based upon his actions as warden would be outside the relevant two-year statute of limitations. *See* K.S.A. 60-513(a)(4).

And with respect to the generalized complaint that Roberts and Goddard, in their state KDOC roles should have instituted different rules for processing inmates in segregation, the plaintiff has failed to provide evidence that the State Secretary had the responsibility for crafting particularized regulations for prisons within the KDOC system. The plaintiff has failed

Finally, Grissom alleges that the defendants in the Amended Complaint held him in segregation as a part of a conspiracy to force him to reveal where he hid the bodies of the women he murdered. These allegations are substantially similar to conspiracy theories set forth and rejected in *Grissom I.* Rather than being the product of any underlying conspiracy, the court determined in *Grissom I* that the plaintiff's lengthy segregation was the product of his repeated violation of prison rules:

> Plaintiff was initially placed in administrative segregation as a result of an investigation into his role as a key participant in the distribution and sale of narcotics at LCF. Thereafter, prison officials reasonably found that Plaintiff was an escape risk based on statements made in a letter written to him. Plaintiff admits that on three separate occasions thereafter, he was convicted of trafficking or possessing contraband, including cell phones.

2012 WL 3732895, at *11.

Turning to the Supplemental Complaint, as noted earlier the plaintiff presents various claims related to his treatment while in segregation. Generally, he alleges that the Supplemental Complaint defendants imposed additional restrictions or deprivations as acts of retaliation for his participation in conduct protected by the First Amendment. He also alleges that these deprivations amounted to cruel and unusual punishment in violation of the Eighth Amendment.

To support his First Amendment retaliation claim, the plaintiff must provide proof that he engaged in constitutionally-protected conduct, that the defendants caused him an

---

to demonstrate that either Roberts or Grissom, in their state-wide secretarial capacities, were personally involved in any decision as to his segregation. Similarly, Grissom has cited no authority requiring a particular review procedure for segregated inmates, or that such a procedure would have resulted in his earlier return to general population.

injury which would chill a person of ordinary firmness from continuing that conduct, and that the defendants were substantially motivated by that conduct. *Shero v. City Grove, Okla.*, 510 F.3d 1196, 1203 (10th Cir. 2007). However, mere allegations of retaliatory motive are insufficient to defeat a motion for summary judgment. *Mollie v. Ward*, 106 F.3d 414, 1997 WL 22525, at * 1 (10th Cir. 1997). A claim of retaliation must rest on evidence of improper motive, not mere allegation. *See Smith v. Maschner*, 899 F.2d 940, 948 n. 4 (10th Cir. 1990). *See also Peterson v. Shanks*, 149 F.3d 1140, 1144 (10th Cir. 1998) ("inmate claiming retaliation must allege *specific facts* showing retaliation because of the exercise of the prisoner's constitutional rights") (emphasis in original, internal quotation omitted).

To support his claim that various restrictions during his term of segregation violated his rights under the Eighth Amendment, the plaintiff must show that the restriction deprived him of "'the minimal civilized measure of life's necessities' as measured under a contemporary standard of decency." *Jackson v. Wilkinson*, 2016 WL 7336570, at *2 (10th Cir. Dec. 19, 2016) (holding deprivation of television, MP3 player, and charger did not amount to cruel and unusual punishment). *See also Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803,809 (10th Cir. 1999) ("An Eighth Amendment claim has ... an objective component—whether the deprivation is sufficiently serious").

Here, summary judgment is appropriate because the plaintiff has failed to show that the claimed acts of retaliation — such as the allegation that Grey signed a grievance form using her supervisor's name, the failure to turn in a canteen "bubble sheet," or mistakenly listing in a form the reason for holding his personal property in storage — are not

sufficiently serious to deter an ordinary person from continuing in the allegedly protected conduct. Set against his underlying prison term itself and the additional commitment to administrative segregation, the conduct alleged in the Supplemental Complaint represents relative inconveniences, or restrictions which are inherent in segregation status. Further, the supposed retaliations certainly had no chilling effect on the plaintiff himself, who continued to energetically present additional grievances each month.

Summary judgment is warranted as to plaintiff's First Amendment claims because the plaintiff has failed to show that any defendant acted with a retaliatory motive. Here, while there may be some general temporal proximity between Grissom's grievances and the various restrictions cited in the Supplemental Complaint, this may simply be a function of the plaintiff's filing of so many grievances. Generally, such proximity is insufficient to defeat summary judgment. *See Wright v. McCotter*, 1999 WL 76904, *1 (10th Cir. Feb. 18, 1999) ("Standing alone, some temporal proximity between Plaintiff's grievance and lawsuit filings and the administrative segregation does not constitute sufficient circumstantial proof of a retaliatory motive to state a claim.").

Finally, as to each alleged deprivation, the court finds that the cited conduct was not a restriction which deprived plaintiff of the necessities of life in light of contemporary standards of decency.

For example, as noted above, the plaintiff alleges that defendants Martin and Austin, as a condition for being allowed into the yard, required him to remain in his boxer shorts in his cell for up to two hours. The evidence from the defendants establishes that

inmates in segregation are merely required to be in boxer shorts at the time each prisoner is processed for entry into the yard; there is no requirement the inmate remain in boxer shorts for any set period of time. The requirement that the inmates be in boxer shorts serves a legitimate penological interest — preventing segregated inmates from carrying weapons or contraband into the prison yard. And the requirement the inmate be in boxer shorts when the guard reaches each cell facilitates the efficient processing of inmates into the yard. The defendants note authority finding comparable prison clothing restrictions did not amount to constitutional violations, *see Mauchlin v. Bier*, 2010 WL 419397, at *4 (D. Colo. Jan. 28, 2010), *aff'd*, 396 F. App'x 519 (10th Cir. 2010); *DeSpain v. Uphoff*, 229 F.3d 1162, 2000 WL 1228003 (10th Cir. August 30, 2000), and plaintiff has failed to present any authority indicating that defendant Austin violated any clearly established constitutional right.[3]

Similarly, the allegation that defendants illegally seized Grissom's personal property or failed to return it lacks evidentiary support. The evidence establishes that the plaintiff was temporarily deprived of some property while he was placed in an intermediate observation cell, consistent with prison rules regarding the possession of personal property. The evidence does not show any substantial or permanent deprivation of property, fails

---

[3] Plaintiff also complains that Austin advanced the incentive level rating of other inmates, but not him. She also, he alleges, placed a sign over his door that he was not permitted phone calls. However, prison procedure establishes that Austin could not have advanced Grissom's incentive level because he was ineligible for advancement for other reasons. Further, the evidence before the court is that all prisoners in disciplinary segregation are prohibited from making phone calls.

to show that Grissom suffered any material injury from the deprivation,[4] and fails to show that any defendant acted with a retaliatory motive. The plaintiff was temporarily deprived of certain property as the result of prison procedures, not as a part of a retaliatory plot by prison staff.

Finally, the evidence establishes that toward the end of 2016 the plaintiff was moved from administrative segregation and placed on a Behavior Modification Program (BMP). The BMP provides a means for the release of inmates from administrative segregation into general population. Under the program, which may be completed early, an inmate will be removed back to segregation only if he fails the program. And after his participation in the BMP, prison officials returned Grissom from segregation to the prison's general population on December 5, 2016, where he remains. The removal occurred at step three of the prison's BMP. The evidence before the court establishes that Grissom will not be returned to segregation, in the absence of additional violation of prison rules.

Unlike *Reza v. Nalley,* 677 F.2d 1001 (10th Cir. 2012), where the potential for additional segregation was not moot given the failure of the defendants to demonstrate the existence of procedures which would correct such placements, the evidence in the present action does not demonstrate any substantial flaw in the El Dorado BMP procedures. As a result, the plaintiff's claim for injunctive relief is moot, and the court lacks jurisdiction in

---

[4] For example, Grissom alleges that certain signed statements from other prisoners were not in his papers when they were returned to him. But Grissom was placed in segregation as the result of passing a sexually explicit note to a staff officer. Any statement from another inmate would not have been relevant to the disciplinary charge against him. The plaintiff has failed to show any material injury from the loss of the statements.

the absence of an ongoing controversy. *See Habecker v. Town of Estes Park*, 518 F.3d 1217, 1223 (10th Cir.2008); *Beierle v. Colorado Dep't of Corr.*, 79 Fed. Appx. 373, 375 (10th Cir. 2003).

Finally, the court denies Grissom's motion for injunctive relief (Dkt. 68). To the extent the motion seeks relief for the prior placement in segregation, the request is moot for the reasons stated earlier. To the extent that Grissom seeks to enjoin any future placement in segregation, the court denies the motion. The plaintiff's underlying claim is unlikely to succeed on the merits, an essential element of injunctive relief. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). Grissom offers nothing but speculation about the possibility that he may be placed in segregation at some future time. Moreover, as discussed earlier, Grissom's underlying constitutional claims as to the previous segregation are without merit, and the additional speculation about future deprivation does not alter this conclusion.

IT IS ACCORDINGLY ORDERED this 24th day of July, 2017, that the defendants' Motions for Summary Judgment (Dkt. 35, 45, 75) are granted; plaintiff's Motion for Injunctive Relief (Dkt. 68) is denied.

                                         ___s/ J. Thomas Marten_____
                                         J. THOMAS MARTEN, JUDGE